LUTHER BONHAM, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 66799. Promulgated February 14, 1936.

*Peter S. Rask, Esq.*, and *P. J. Coffey, Esq.*, for the petitioner.
*E. L. Corbin, Esq.*, for the respondent.

**OPINION.**

TURNER: In his determination as originally made the respondent applied the provisions of subsection (c) (1)[1] of section 112 of the Revenue Act of 1928, thereby limiting the petitioner's taxable gain from the transaction in question to $67,500, the amount of cash received. The petitioner does not dispute the application of this provision of the statute to the facts in this case, but alleges that if the proper basis for the bank stock, and the fair market value of the company stock received therefor are used in the computation, it is apparent that no taxable gain was realized.

By amended answer the respondent now contends that subsection (c) (1), *supra*, is inapplicable, and that the petitioner realized taxable gain to the extent of the difference between the basis of the bank stock and the cash plus the fair market value of the company stock received.

From an examination of the statute, it is apparent that in this case the applicability of subsection (c) (1) is dependent upon subsection (b) (3)[2] of the same section of the act. It is necessary

---

[1] Sec. 112. (c) *Gain from exchanges not solely in kind.*—

(1) If an exchange would be within the provisions of subsection (b) (1), (2), (3), or (5) of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

[2] Sec. 112. (b) (3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

therefore to determine whether or not the exchange of bank stock for company stock would be within the provisions of subsection (b) (3) if the item of cash had been omitted and only company stock had been received in exchange for bank stock.

To make subsection (b) (3) applicable the exchange must have been in pursuance of a plan of reorganization and both the bank and the company must have been parties to that reorganization. Subsection (i) (1) of section 112 of the Revenue Act of 1928 defines the term "reorganization" as "a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, * * *)." Subsection (i) (2) of the same section provides that the term "a party to a reorganization" includes "both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation."

Giving careful consideration to the meaning of the term "reorganization" quoted above from the statute and the facts in this case after omitting from consideration, in accordance with the provisions of subsection (c) (1), the cash payment received by the stockholders of the bank, we can find nothing of substance which would distinguish this case from that of *Commissioner* v. *Watts*, 296 U. S. 387. Under authority of that decision, we accordingly hold that but for the fact that cash was received in the instant transaction, the exchange would be within subsection (b) (3) of section 112, *supra*, and under subsection (c) (1) of the same section the gain to the petitioner may not be recognized in an amount in excess of $67,500.

So far as the record shows, the parties have accepted cost as the basis for computing the gain on all of the bank stock transferred except the 520 shares which the petitioner acquired by inheritance, and with reference to the 520 shares they are in apparent agreement that the basis is the fair market value of the stock on January 29, 1920. The petitioner contends that the stock had a fair market value of $279.64 on that date, while the respondent takes the position that the fair market value of the stock was $175 per share, as reflected by sales made soon thereafter and over a period of several years.

The petitioner claims that the fair market value of the bank assets on the date in question was $204,635.36, or approximately $204 for each share of stock outstanding and relies on the testimony of several witnesses, called in his behalf, who were of the opinion that the fair market value of the stock was between $250 and $270 per share. On the other hand it is noted that the book value of the capital stock on January 29, 1920, was only $128,059.36, or ap-

proximately $128 per share. Further, it appears, from the statement of earnings and dividends introduced in evidence by the petitioner, that net earnings adjusted to reflect losses on loans and bonds, and all recoveries for the years 1915 to 1920, inclusive, were $9,429.26, $11,919.79, $5,643.80, $8,094.31, $10,971.65, and $15,016.50, respectively, and that the net earnings so adjusted did not again reach the high of 1920 until the year 1928. It is also noted that all sales or purchases of the stock in 1920, or near that time, were made at $175 per share.

After considering all of the evidence before us, we have decided and have found as a fact that the fair market value of the bank stock on January 29, 1920, was $175 per share.

The next question for determination is the fair market value of the stock of the Northwest Bancorporation on October 30, 1929. While it might be argued that this stock was valued at $90 per share under the contract, it is apparent that that figure was used as the basis of exchange and not as an indication of fair market value at a given date. The contract did not give the petitioner the privilege of receiving $360 per share for his bank stock, but required him to accept a minimum of three shares of Northwest Bancorporation stock and a maximum of cash in the sum of $90. Such a provision in the contract could not be held to establish the fair market value for the stock on the date of exchange in the face of evidence introduced by the petitioner showing sales of 2,883 shares of the stock on that date on the St. Paul Stock Exchange, at prices ranging from a low of 66½ to a high of 71 and a closing price of 70. The petitioner has alleged in his petition that the stock on that date had a fair market value of $70 per share and we have so found as a fact.

The only remaining question to be determined is whether or not the petitioner, being on a cash receipts and disbursements basis, received in the taxable year the 750 shares of the Northwest Bancorporation stock covered by paragraph 4 of the contract. If so, this stock, at $70 per share, must also be included in computing the gain recognized for the year 1929.

The petitioner contends that never at any moment until this stock was released to him in 1931 and 1932 did he receive it or have a right to receive it, and that under no circumstances did it constitute income to him in any prior year.

The contract between the parties best reflects the actual transaction. By its terms the petitioner and his wife disposed of 750 shares of bank stock and received therefor 2,250 shares of stock of the Northwest Bancorporation and $67,500 in cash. In section 4

of the contract, it appears that the company had questioned certain paper carried in the assets of the bank, and the 750 shares of stock were deposited with the company and were to be held by it until the actual work-out of these assets had been determined. According to the terms of the contract the petitioner and his wife received the entire amount of the stock in the year 1929 and posted the 750 shares as security for the representations made by them with reference to the assets of the bank. Cf. *Mead Construction Co.*, 3 B. T. A. 438, and *Cleveland Trinidad Paving Co.*, 20 B. T. A. 772; affd., 62 Fed. (2d) 85. See also *Preston R. Bassett*, 33 B. T. A. 182, and *Stoner* v. *Commissioner*, 79 Fed. (2d) 75, reversing 29 B. T. A. 953. In the last two cases cited stock was sold for cash and it was pointed out in the opinions that the sellers did not receive in the taxable year the full amount of the purchase price, nor did they have the right to receive it. Payment of this balance was conditional and it was held that such balance did not constitute income until the events on which payment was conditioned were fulfilled. This case is different. Here the contract contained no condition whatever with reference to the payment of the full amount of the stock agreed upon. Even though the assets of the bank did not work out as represented, there was no right on the part of the seller to reduce the number or to take back any of the shares exchanged under the contract, but only a right to sell collateral to the extent required to make good the representations as to the bank assets. Ownership of this stock had passed to the petitioner and he was exactly in the same situation as if other securities had been deposited in the place of the 750 shares of company stock.

On this point the petitioner relies on *Commissioner* v. *Darnell, Inc.*, 60 Fed. (2d) 82, affirming a decision of the Board reported at 18 B. T. A. 125. There the facts are quite different from the facts here. In that case the petitioner was selling a sawmill and the price to be received was conditioned on the amount of timber available. The purchasers had offered a fixed price for the mill provided a definite amount of timber should be guaranteed, but the petitioner refused such a contract and the contract entered into postponed both the determination of and final settlement on the purchase price of the mill until the actual work-out of the timber was known. In the instant case the amount of cash and number of shares to be transferred were fixed, and the transfers made, and in this respect the transaction was not thereafter to be disturbed, the company having only the right to sell company stock, held by it as collateral, to the extent necessary to make itself whole in respect of the representations of the shareholders of the bank.

On this point the respondent is sustained and the 750 shares of stock in question should be included in computing petitioner's taxable income for the year 1929.

Reviewed by the Board.

*Decision will be under Rule 50.*

---

ARUNDELL, dissenting: I disagree with the holding in the majority report to the effect that petitioner received in 1929 750 shares of stock of the Northwest Bancorporation. As a matter of fact, the shares were not received by the taxpayer within that year, either actually or constructively. He had no right within the year to demand their delivery and indeed did not receive them until the years 1931 and 1932. In 1929 it was not definitely known if he would ever receive the shares in question. Under such circumstances it seems to me that the conclusion reached in the majority opinion on this point is wrong. *Commissioner* v. *Cleveland Trinidad Paving Co.*, 62 Fed. (2d) 85; *Stoner* v. *Commissioner*, 79 Fed. (2d) 75; *Preston R. Bassett*, 33 B. T. A. 182. *Mead Construction Co.*, 3 B. T. A. 438, treats of a deduction and is not in point.

TRAMMELL agrees with this dissent.