Hegra Note Corporation v. Commissioner.
Hegra Note Corp. v. Commissioner
Docket No. 5035-63.
United States Tax Court
T.C. Memo 1966-87; 1966 Tax Ct. Memo LEXIS 195; 25 T.C.M. (CCH) 479; T.C.M. (RIA) 66087; April 25, 1966
E. Michael Masinter, First National Bank Bldg., Atlanta, Ga., for the petitioner. Arthur P. Tranakos, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in the income tax of petitioner for the taxable year ended May 31, 1961, in the amount of $80,101.72. The issue for decision *196 is whether the transfer by petitioner of installment obligations resulted in a capital gain and, if so, the amount thereof. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, Hegra Note Corporation, organized on June 29, 1960, under the laws of the State of Georgia, filed its corporate Federal income tax return for the fiscal year ended May 31, 1961, with the district director of internal revenue, Atlanta, Georgia. Petitioner for that year kept its records and filed its Federal income tax return on a cash receipts and disbursements method. Immediately after incorporation, petitioner's sole asset was seven installment notes with an aggregate face value of $385,000 and an aggregate adjusted basis to it of $64,593.10. The seven notes, all dated January 15, 1957, were to mature $30,000 on January 15, 1961, and $59,166.66 on January 15 of each of the years 1962 through 1967. Petitioner received the notes from the original note-holders solely in exchange for all of its outstanding stock. The notes were installment obligations within the meaning of section 453 of the Internal Revenue Code of 1954. These seven notes *197 had been received by the persons who transferred them to petitioner as part of a transaction pursuant to a contract dated October 30, 1956, under which the stockholders of the Henry Grady Hotel Corp. (hereinafter referred to as old Henry Grady) sold all the stock of that corporation, 22,500 shares of preferred and 7,500 shares of common, to Jacs Line Realty Corp. On January 15, 1957, Jacs Line issued 10 notes totaling $474,999.96 payable to Phoenix, Inc., as part of the purchase price. The notes bore interest at the rate of 4 percent payable semiannually, were secured by the stock of old Henry Grady, and matured serially on January 15 of each year 1958 through 1967. The first 4 notes were in the amount of $30,000 each and the remaining 6 were in the amount of $59,166.66. Phoenix, Inc., was the major stockholder of old Henry Grady. Jacs Line Realty Corp. contracted in 1957 to sell the old Henry Grady stock to Herbert Schoenbrod, who assigned his rights under the contract to H & G Hotel Corp. (hereinafter referred to as H & G). A condition of the contract of sale was that Jacs Line gain the approval of Phoenix, Inc., and of the trustees under the wills of Cecil R. Cannon and Fred B. *198 Wilson to the liquidation of old Henry Grady. Phoenix, Inc., agreed to the liquidation only upon the conditions set forth in an agreement dated August 15, 1957, wherein William J. Friedman and Julius Epstein made a limited personal guarantee of the notes. The rate of interest on the notes was raised from 4 percent to 5 percent as of July 15, 1957. Friedman and Epstein agreed that if H & G made aggregate payments in respect to the principal of certain notes other than the Phoenix notes in excess of $300,000, they would cause payment of a like amount to be made on the Phoenix notes, the payments to be applied in inverse order of the maturity date of the Phoenix notes. Friedman and Epstein further agreed that in the event of default by H & G on the Phoenix notes, they guaranteed payment of the Phoenix notes to the extent of the lesser of the aggregate amount paid by H & G on certain other notes or $300,000, the guarantee to be applied to the Phoenix notes in inverse order of their maturity. H & G then acquired the stock of old Henry Grady and assumed liability on the notes. Subsequently, H & G changed its name to Henry Grady Hotel Corporation (hereinafter referred to as new Henry Grady). *199 The new Henry Grady remained the prime obligor on the notes and the original noteholders continued to hold them until June 29, 1960, when seven of the notes were transferred to petitioner in exchange for all of the stock of petitioner newly organized, as set out above. The first three notes, each in the amount of $30,000 had been paid when due on January 15, 1958, 1959, and 1960. The assignment to petitioner of the seven Phoenix notes executed by Phoenix, Inc., included an assignment of all security given to Phoenix, Inc., for payment of the notes specifically listing as security so assigned its interest in the new Henry Grady stock and "Its rights, privileges, powers and interests under an agreement of August 15, 1957, between Julius Epstein and William J. Friedman, and Phoenix, Inc." Prior to transfer of the seven notes to petitioner, negotiations had been carried on between Phoenix, Inc., representing the original noteholders, and Kennesaw Life and Accident Insurance Company (hereinafter referred to as Kennesaw), concerning acquisition of the notes by Kennesaw. Kennesaw is a Georgia corporation and is subject to the laws of the State of Georgia regulating insurance companies. *200 In order for the notes to be listed as an admitted asset on the financial statements of Kennesaw, it was necessary that Kennesaw obtain approval of the Insurance Commissioner of the State of Georgia. On May 25, 1960, Kennesaw requested permission of the Insurance Commissioner to acquire the seven notes in exchange for 154,000 shares of voting common stock of Kennesaw, stating in part: The Henry Grady Hotel Corporation operates the well known Henry Grady Hotel * * *. Except for a period during the depth of the depression, it has been a highly successful and profitable operation. The Chairman of the Board of the Hotel Corporation is Mr. William Friedman, well known Chicago attorney, who is Secretary and Counsel for the Hilton Hotel chain. The President is Mr. L. O. Moseley, who has been with the hotel for many years in an executive capacity. * * * since the notes are secured by the Kennesaw stock, there is absolutely no way for Kennesaw to lose any money on the transaction, because if the notes are not paid the stock will be cancelled. One of the principal purposes of Kennesaw in acquiring the seven installment notes was to enable it to carry the notes as an admitted asset on *201 its financial statement and to reflect in its capital that 154,000 shares of common stock had been issued. The par value of the Kennesaw common stock was $1 per share. Kennesaw intended to reflect the transaction by listing the notes as an asset at a value of $385,000 and by increasing capital by $154,000 and surplus by $231,000, thereby enabling the company to write additional insurance. Phoenix, Inc., advised the noteholders on May 13, 1960, that Kennesaw proposed that, subject to the approval of the Insurance Commissioner, it would acquire all of the notes in exchange for 154,000 shares of Kennesaw voting common stock, on condition that payment of the notes be guaranteed by depositing the Kennesaw stock in escrow. The Insurance Commissioner informed Kennesaw by letter dated June 27, 1960, that the transaction was not within its purview, inasmuch as it was "more in the nature of a subscription contract for stock than an ordinary investment" since Kennesaw did not intend to invest any of its assets. The only issue of concern to the Insurance Commissioner was whether the notes should be allowed as "admitted assets." The Insurance Commissioner wrote in part: * * * Since the notes *202 appear to be a good credit risk and the payment thereof will be guaranteed by the 154,000 shares of stock of the Kennesaw Life that will be issued and not delivered, but pledged as security for the payment of the Hegra notes, I will interpose no objection to them being carried as an admitted asset, provided the Kennesaw Life and the Hegra Corporation will enter into an agreement stipulating in substance that; in the event any of the notes should be in default as to pricinipal [principal] or interest, or both, for more than sixty days, the Hegra Corporation will relinguish [relinquish] all rights and claims to the 154,000 shares of Kennesaw stock in excess of the amount of principal paid on the notes at that time on the basis of $2.50 shares, the Kennesaw retaining all interest paid on these notes without any credit therefor being allowed against the purchase price of the stock and the Kennesaw to return to Hegra the remaining unpaid notes of the Henry Grady Corporation. On June 29, 1960, petitioner executed an assignment of the seven notes, without recourse, to Kennesaw together with all security for the notes as enumerated in the transfer of the notes from Phoenix, Inc., to *203 petitioner. On June 29, 1960, Kennesaw had a certificate for 154,000 shares of its stock issued in petitioner's name but retained by one of its officers. Petitioner executed an agreement on June 29, 1960, which read in part as follows: To secure the payment of the principal and interest of the seven notes, * * * the undersigned Hegra Note Corporation hereby transfers, sells and assigns to Kennesaw Life and Accident Insurance Company the attached certificate #AO-11383 for 154,000 shares of common stock of the Kennesaw Life and Accident Insurance Company. If any of such notes should be in default as to principal or interest or both for more than sixty days after notice of such default to the Hegra Note Corporation, then the said Kennesaw Life and Accident Insurance Company shall cancel said certificate of Kennesaw Life common stock attached hereto; and shall issue to Hegra Note Corporation a new certificate for a number of shares equal to the amount of principal (divided by 2.50) which has been theretofore paid to Kennesaw on such Henry Grady Hotel Corporation notes. Kennesaw shall retain the balance of the canceled shares, and shall reassign to the Hegra Note Corporation without *204 recourse such Henry Grady Hotel Corporation notes still held by Kennesaw. * * *
Interest which may have been paid prior to any such default shall be the sole property of Kennesaw and no portion thereof shall be applied against the purchase price of Kennesaw Life stock or refundable to Hegra Note Corporation. The undersigned shall be entitled to vote the Kennesaw Life stock hereby pledged and to receive all dividends which may be paid thereon until Kennesaw shall take action after a default as above authorized; after which the undersigned shall have voting and dividend rights only in respect of those shares of Kennesaw which have been paid for at the rate of $2.50 per share out of the principal payments on said notes. Petitioner on June 29, 1960 also executed an "Assignment Separate from Certificate" and power of attorney to Kennesaw transferring to Kennesaw the stock standing in its name on Kennesaw's books and authorizing Kennesaw to transfer such stock on the books. Kennesaw stock was traded, but not very actively, on the Atlanta over-the-counter market. On May 13, 1960, it was quoted at 2 3/8 bid, 2 7/8 asked. On June 29, 1960, it was at 2 bid, 2 1/4 asked. Kennesaw *205 has never paid a cash dividend. Each year since June 29, 1960, petitioner has signed the management proxy permitting management to vote its Kennesaw shares. At the time of negotiation of the agreement for the issuance in petitioner's name of the Kennesaw stock, petitioner's representatives had stated to representatives of Kennesaw that petitioner intended to execute such proxies. In accordance with its intention in entering into the transaction, Kennesaw on its books increased its capital by $154,000 and its surplus by $231,000. On its balance sheets Kennesaw entered the notes as admitted assets with a valuation of $385,000. The transaction between Kennesaw and petitioner was at arm's length. There was no common member on the boards of the corporations involved. Phoenix, Inc., the major owner of the equitable interest in the notes, wrote to the other owners of equitable interests in the notes on May 13, 1960, that "there is no possibility of any enhancement [in the value of the notes] * * * The stock which you would receive * * * would follow the fortunes of Kennesaw Life with substantial possibilities of enhancement." Kennesaw stated in its letter of May 25, 1960, to the Insurance *206 Commissioner that: * * * These notes represent approximately 40% of the purchase price for all of the stock of the Henry Grady Hotel Company, the balance having been previously paid in cash. Since the purchasers invested over $500,000 in the Henry Grady stock and the purchasers are men of substance and I think there is every reason to believe that the Henry Grady Hotel Corporation notes will be paid as they mature. * * *
The parties chose this method of issuance and reassignment of the shares, with provision for cancellation on default, in order to avoid escrow fee expense and the necessity and expense of foreclosure proceedings in the event of default. On January 18, 1961, the principal payment of $30,000 due on January 15, 1961 on the installment notes was made to Kennesaw. Interest payments were made on January 15, 1961, and June 15, 1961. Default occurred with respect to the principal and interest payments due January 15, 1962. On January 19, 1962, new Henry Grady filed a voluntary petition in bankruptcy in the United States District Court for the Northern District of Georgia, Atlanta Division, under Chapter XI of the Bankruptcy Act. Kennesaw gave notice of default *207 to petitioner on February 2, 1962. Subsequent thereto, the Fulton National Bank, as Trustee under the wills of Cecil Cannon and Fred B. Wilson purchased the notes for $30,000. Kennesaw and petitioner agreed to treat this payment as a payment of principal. On July 18, 1962, Kennesaw delivered 25,000 shares of its voting common stock to petitioner on the basis of the principal payment of January 18, 1961, and the $30,000 paid by the Trustee of the wills of Cecil Cannon and Fred B. Wilson, these payments aggregating $62,500. [1] The remaining 129,000 shares of the 154,000 shares which had been issued were cancelled. In June 1960 the highest grade corporate bonds as listed in Standard and Poor's Guide were selling at yields of approximately 4 1/2 percent and lesser grade bonds were selling at 4 3/4 to 5 1/4 percent and the lowest grade bonds were selling at even higher yields. At this same certain subordinated debentures of the Hilton Hotel and one bond issue of the Sheraton Corporation were selling at yields of approximately 7 1/2 percent. Beginning in the 1950's, *208 motels built throughout the country tended to draw business away from major hotels and this factor had an unfavorable effect on hotel securities. The balance sheet of new Henry Grady as of June 30, 1960, shows total current assets of $205,599.81 and total current liabilities of $651,864.17, which included an item denominated "notes payable - current portion" in the amount of $470,531.40. Total assets shown by this balance sheet were $4,066,730.06, which included building and equipment shown at a cost of $4,777,862.81 with depreciation deducted therefrom of $1,145,632.56 leaving a net asset value for such fixed assets of $3,632,230.25. Other than current liabilities, the liabilities included on the balance sheet were Non-Current Notes Payable of $3,186,825.90, capital stock of $300,000 and a deficit in retained earnings of $71,960.01, making total liabilities and capital equal to total assets. The profit and loss statement for the year ended June 30, 1960, showed gross operating income of $777,409.68 and net profit before depreciation of $267,772.52 from which was deducted depreciation of $380,320.14 resulting in a net loss before tax credit of $112,547.62 and a net loss after income *209 tax credit of $86,380.83. This net loss was used in computing the deficit of $71,960.01 shown on the balance sheet as of June 30, 1960. The balance sheet of new Henry Grady as of June 30, 1959, showed total current assets of $198,225.38 and total current liabilities of $574,190.85, which included an item denominated "Notes payable - current portion" in the amount of $394,071.40. Total assets shown by this balance sheet were $4,299,108.49, which included building and equipment shown at a cost of $4,668,772.41 with depreciation deducted therefrom of $796,789.30 leaving a net asset value for such fixed assets of $3,871,983.11. Other than current liabilities, the liabilities included on the balance sheet were Non-Current Notes Payable of $3,435,357.30, capital stock of $300,000 and a deficit in retained earnings of $10,439.66 making total liabilities and capital equal to total assets. The profit and loss statement for the year ended June 30, 1959, showed gross operating income of $869,812.48 and net profit before depreciation of $383,562.21 from which was deducted depreciation of $407,348.67 resulting in a net loss of $23,786.46. This net loss was used in computing the deficit of $10,439.66 *210 shown on the balance sheet as of June 30, 1959. The balance sheet of the new Henry Grady as of January 31, 1958, shows total current assets of $131,780.79 and total current liabilities of $601,703.16, which included an item denominated "Notes Payable-Maturing in one year" in the amount of $390,071.40. Total assets shown by this balance sheet were $4,835,863.07, which included building and equipment and furniture and fixtures of $4,641,672.19 with depreciation deducted therefrom of $203,000, leaving a net capital asset value of $4,438,672.19. Other than current liabilities, the liabilities included on the balance sheet were a First Mortgage Five Percent Loan of $18,942.99 and Notes Payable of $3,874,071.55 making a total of long-term liabilities of $3,893,014.54, capital stock outstanding of $325,000 and surplus of $41,145.37 making total liabilities and capital equal to total assets. The profit and loss statement for the 7 months' period ended January 31, 1958, shows gross operating income of $605,972.05 and net profit before depreciation of $310,579.77 from which was deducted depreciation of $244,829.50 resulting in a net profit of $65,750.27. The profit and loss statement for *211 the 7 months' period ended January 31, 1957, shows gross operating income of $517,556.63 and net profit before depreciation of $267,425.92 from which was deducted depreciation of $189,570.29 resulting in a net profit of $77,855.63. The profit and loss statement for the 6 months' period ended December 31, 1956, shows gross operating income of $438,843.55 and net profit before depreciation of $223,682.61 from which was deducted depreciation of $162,488.82 resulting in a net profit of $61,193.79. Petitioner, on its 1960 income tax return, reported the exchange of the $385,000 face value installment notes for 154,000 shares of Kennesaw common stock as a nontaxable transaction under section 368(a)(1)(C). Respondent determined that petitioner had realized a long-term capital gain of $320,406.90 on the transaction with the following explanation: It is determined that you realized a long-term capital gain of $320,406.90 in the taxable year ended May 31, 1961 resulting from the transfer on June 30, 1960 of installment notes with a face value of $385,000.00 to the Kennesaw Life and Accident Insurance Company. Section 453(d) of the Internal Revenue Code of 1954. *212 Inasmuch as you reported such transaction on your return as a non-taxable exchange under section 368(a)(1)(C) of the Internal Revenue Code of 1954, your taxable income is increased by such gain. Opinion Section 453(d)(1) of the Internal Revenue Code of 1954[2] provides that if an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or the fair market value of the obligation at the time of the distribution, transmission, or disposition in case of disposition other than by sale or exchange. In the instant case the parties, without specifically so stating, apparently have no disagreement on whether petitioner disposed of its installment obligations. The Hegra notes were assigned by petitioner to Kennesaw and were placed completely outside of petitioner's dominion and control. Under *213 the agreement, upon default in payment on the notes for a period of 60 days and after Kennesaw had notified petitioner of such default by Henry Grady, the notes were to be returned by Kennesaw to petitioner. Any such default by Henry Grady on the notes was, of course, a circumstance over which petitioner had no control. Petitioner's transfer of the notes to Kennesaw constituted a disposition of the installment obligations by petitioner. Thos. Goggan & Bro., 45 B.T.A. 218 (1941), and Burrell Groves, Inc., 22 T.C. 1134 (1954), affd. 223 F. 2d 526 (C.A. 5, 1955).[3]
*214 Petitioner's primary contention is that the transfer of the installment notes was not a closed transaction in which it, a cash basis taxpayer, received money or other property which had an ascertainable fair market value. Petitioner argues that it exchanged its installment obligations not for stock with an ascertainable fair market value but for a right to receive stock which, although it might constitute some type of property, was not the equivalent of cash so as to constitute a receipt of property by a cash basis taxpayer. As we interpret petitioner's argument, it is that it disposed of the Kennesaw note in an exchange for property so that under the provision of section 453(d)(1)(A) its gain is determined by the difference between the basis to it of these obligations and the amount it realized in the exchange. Petitioner then contends that the amount it realized in the exchange has no ascertainable fair market value and therefore is not to be included as any amount in computing the gain realized by a cash basis taxpayer. It is respondent's primary position that petitioner actually received the Kennesaw stock and that the value of the Kennesaw stock so received was the $385,000 *215 represented by $2.50 per share, the sales price of the stock recognized in the agreement. Respondent contends that if it is considered that petitioner did not actually receive the Kennesaw stock, then petitioner constructively received this stock. Respondent in the alternative contends that if it should be determined that petitioner did not actually or constructively receive the Kennesaw stock and that the installment notes were, as petitioner contends, exchanged for a right to receive 154,000 shares of Kennesaw stock, this right had a determinable fair market value of the $385,000 face amount of the installment notes. It is petitioner's position that if the right to receive shares of Kennesaw stock had any fair market value, such value was less than petitioner's basis in the installment notes. We have set forth in our findings the pertinent provisions of the agreement between Kennesaw and petitioner with respect to the assignment of the notes, and the issuance of Kennesaw stock. We have also found that the certificate of Kennesaw stock issued in petitioner's name was never delivered to petitioner but was turned over to an officer of Kennesaw to be held in accordance with the *216 terms of the agreement between petitioner and Kennesaw. We have also found that under petitioner's agreement with Kennesaw it was to receive any dividends on and have the right to vote the entire 154,000 shares of Kennesaw stock so long as there was no default on payment on the installment obligations of Henry Grady, which had been transferred to Kennesaw. The facts show that no dividends were paid on the Kennesaw stock and that petitioner did, in fact, give proxies to the management of Kennesaw to vote the stock issued in petitioner's name. There are numerous cases dealing with the question of whether stock is actually or constructively received by a taxpayer where a certificate evidencing the ownership of such shares is issued in the name of but not delivered to that taxpayer or is issued to an agent or trustee of that taxpayer to be held until the performance of some act or is not issued to that taxpayer. These cases generally recognize that a certificate of stock is merely the evidence of ownership and that the true criterion in determining ownership of stock is whether sufficient rights *217 with respect to the stock were received to constitute the taxpayer the owner thereof. See Mayer v. Donnelly 247 F. 2d 322 (C.A. 5, 1957). In the instant case if petitioner's rights in the Kennesaw stock gave it dominion and control over the stock, together with the economic interests therein inherent in ownership, then petitioner actually received the stock even though the certificate issued in its name was never delivered to it. If the rights in the stock which petitioner secured under the agreement with Kennesaw were not sufficient to place the stock under its dominion and control and give it the economic interests of ownership therein, then there was neither actual nor constructive receipt. Numerous cases have referred to various rights with respect to stock to be considered in determining whether ownership thereof has been received by a particular taxpayer. The right to dividends and the right to vote the stock are both considered to be important to the determination. Another factor which has been considered of importance is the right to reap the economic gain inherent in a rise in the price of the stock, or as sometimes expressed, a right to sell or dispose of *218 the stock. The fact that the stock itself is pledged as security for an indebtedness or placed in some form of escrow does not require a conclusion that the taxpayer did not receive the stock. If the circumstances under which the certificate is held are such that the taxpayer would be permitted "to obtain physical possession of the securities at any time upon deposit of substitutes" the stock is merely pledged just as if the taxpayer had obtained the certificate and reassigned it to secure an indebtedness. Center Investment Co., 43 B.T.A. 46, 49 (1940). Likewise, as stated in Luther Bonham, 33 B.T.A. 1100 (1936), affd. 89 F. 2d 725 (C.A. 8, 1937), "a right to sell collateral to the extent required to make good" the debt for which the stock is security does not cause the stock not to be received. In that case it was pointed out that there was no right on the part of the seller of the stock to reduce the number of shares or to take back any of the shares but only the ordinary rights of a pledgee to sell and use a sufficient amount of the proceeds of the sale to discharge the indebtedness. In its affirmance of the Bonham case the Circuit Court *219 stated that, "the right 'to sell * * * on the market' such stock or parts thereof as necessary to make good default" was consistent only with the passing of title to the stock to the person who was guaranteeing the performance and its pledge back as a guarantee. On the other hand in those cases where the stock was retained under such conditions that the economic benefit of an increment in value could not be realized by the taxpayer who had some rights in the stock, it has generally been held that such taxpayer did not have ownership of the stock until such time as he did obtain sufficient rights to enjoy such economic benefits. In Fred C. Hall, 15 T.C. 195, 200 (1950), affd. 194 F. 2d 538 (C.A. 9, 1952), we held that the taxpayer had not received stock until two certificates issued in his name but held by the treasurer of the issuing corporation were delivered to him without restriction. In the Hall case the stock was issued in consideration of services the taxpayer performed. In that case we pointed out that the taxpayer could not sell the shares which were being held by the treasurer until they were delivered to him and the unfettered right to sell is *220 one of the most important attributes of ownership. In Artis C. Bryan, 16 T.C. 972 (1951), we concluded that the taxpayer there involved received stock not in 1935 when the shares were assigned to him by a certificate endorsed as being subject to the conditions contained in an assignment agreement, but received the stock in 1940 when an unconditional certificate was issued to him even though he agreed not to assign or pledge such stock until a note he had given to a bank had been paid in full or otherwise discharged. As was pointed out in Lyle H. Olson, 24 B.T.A. 702 (1931), affd. 67 F. 2d 726 (C.A. 7, 1932), certiorari denied 292 U.S. 637, shares of stock are received by taxpayers at the time they are made "subject to their disposal." See also Estate of W. R. Whitthorne, 44 B.T.A. 1234 (1941). Applying the principles with respect to when stock is received, as set forth in the various cases, to the facts in this case, we conclude that petitioner did not receive the 154,000 shares of stock actually or constructively in 1960. The fact that the certificate was never turned over to petitioner is of consequence only *221 insofar as it has a bearing on the right of the taxpayer to dispose of the stock represented by the certificate. The agreement under which the stock certificate was issued provided that upon default in payment of a note by new Henry Grady, the certificate would be cancelled and only stock which had been paid for by principal payments on the installment obligations would be issued to petitioner. Thus, petitioner's rights in the stock were limited to such an extent that it would not profit economically by increment in the value of the stock except as payments were made on the installment notes. There is nothing in the agreement which indicates that upon default of the notes, the shares of Kennesaw stock would be treated as collateral and sold to the extent necessary to pay the obligation due on the installment notes by new Henry Grady with any excess received going to petitioner, nor was there anything in the contract indicating that petitioner could substitute other security or even cash to the full amount of the installment notes and obtain the stock certificates and full rights in the stock. *222 Where there is a condition upon the receipt of stock which cannot be discharged by the taxpayer who would otherwise be entitled to receive the stock, then although he has received property in the form of contractual rights to receive stock, he has not received the actual stock nor has he constructively received the stock. Although we agree with petitioner that it did not actually or constructively receive the stock, we do not agree that the disposition of the installment notes pursuant to the contract here involved did not result in taxable income. The right to receive stock for which petitioner transferred the installment notes was a right that could be assigned or disposed of by petitioner. Nothing to the contrary appears in the agreement and petitioner does not contend that the right it received was not assignable. As the notes were paid by new Henry Grady, petitioner's rights to a certain number of shares of stock became absolute. This indicates that the right to receive the stock would have a fair market value substantially the same as the installment notes transferred by petitioner to Kennesaw. Petitioner's expert witness so testified and his basis for assigning a value to *223 the right to receive the Kennesaw stock of less than petitioner's basis in the installment notes was because in his opinion the installment notes as of June 29, 1960, had a fair market value of less than petitioner's basis therein. The instant case is distinguishable from the case of Goetze Gasket & Packing Co., 24 T.C. 249 (1955), relied on by petitioner, in which we held that rights to receive additional stock which were part of an agreement for the sale of certain assets were subject to such a substantial contingency that the seller was not required to include any amount representing the value of such rights as a part of the gain on the sale of the assets in the year in which the assets were transferred and cash and other stock received in payment therefor. In that case the shares were to be withheld for 3 years after the closing date as security for the recovery of damages for the breach of any warranties involved in the sale of the assets and cash was paid to the sellers of the assets and 80 percent of the stock was issued outright to them in the year of sale. In the instant case absolute right to receive a portion of the stock arises only upon payment of a portion *224 of the installment notes transferred. Under these circumstances, the contingency as to the receipt of the stock may be equated with the likelihood of payment of the installment notes. The likelihood of payment is one of the primary factors involved generally in valuing any note. Here no money was received and the only "property (other than money) received" for the transfer of the installment notes was the right to receive stock. If this right were considered to have no ascertainable fair market value, the question would arise under section 453(d)(1) whether the transfer of notes constituted an exchange as distinguishable from a disposition other than a sale or exchange. In an exchange, "property is transferred for other property." Bloomington Coca-Cola Bottling Co. v. Commissioner, 189 F. 2d 14 (C.A. 7, 1951), affirming a Memorandum Opinion of this Court. If installment notes were transferred for so nebulous a right that nothing with an ascertainable fair market value might be said to have been received therefor, it would be questionable whether an exchange as distinguished from other disposition of the notes had occurred within the meaning of section 453(d)(1). The *225 clear import of the statute is that upon disposition in any manner of installment obligations, other than certain tax free exchanges, the portion of the gain deferred when the installment method of reporting the gain was elected which has not previously been included in income becomes includable therein. We conclude that the right to receive the Kennesaw stock had a fair market value equal to the fair market value of the installment notes on June 29, 1960. However, if it were concluded that the transfer of these notes was a disposition other than by a sale or exchange, then the gain on the transfer of the notes would be determined by the difference in the fair market value of the installment notes at the date of transfer and petitioner's basis in such notes. The amount of gain so determined would be the same as the amount which we find based on our determination of the fair market value of petitioner's right to receive the Kennesaw stock. Petitioner argues, based upon certain testimony by a witness it offered as an expert, that the fair market value of the installment notes on June 29, 1960, was *226 less than petitioner's basis in those notes. Respondent points to many weaknesses in the testimony of this witness and relies on the prima facie correctness of his determination that the face amount of the notes of $385,000 was the amount received in the transfer thereof. After a consideration of the evidence we have concluded that the installment notes had a fair market value on June 29, 1960, of 66 percent of their face amount. Petitioner's expert testified both as to the general market for hotel bonds and as to his opinion of the value of the specific installment notes involved in this case. This witness showed a knowledge of the general securities market which renders the portion of his testimony that goes to the market conditions for securities generally and for hotel bonds in particular as of June 1960 of some value. He pointed out that for some time prior to June 1960, motels had been competing with hotels so that hotels no longer had the same position in serving the traveling public. He also pointed out that the yield on which certain bonds of large hotel chains were selling was approximately 7 1/2 percent which would mean that if the bonds carried 5 percent interest they *227 would be selling at approximately 66 percent of face value. We are persuaded from this witness' testimony that installment notes of a hotel corporation bearing 5 percent interest would not have a fair market value on June 29, 1960, of their face amount but that the fair market value thereof would be approximately 66 percent of the face amount. Although the complete operations of the new Henry Grady are not shown, the record does show that it operated a downtown Atlanta hotel with a good reputation. Its stock had been sold twice within 5 years of the valuation date here involved. The exact sales price of the stock is not shown, but there are indications in the record that the purchasers invested in cash, amounts in excess of the amounts of the notes here involved. We, therefore, hold that the fair market value of the installment notes which petitioner transferred to Kennesaw on June 29, 1960, was 66 percent of the face amount thereof on the date of transfer and that this same amount is the fair market value of petitioner's right to receive the Kennesaw stock. In reaching this conclusion we have rejected this witness' somewhat more extensive testimony to the effect that the value *228 of the notes was less than petitioner's basis in them, that is, merely 10 or 20 percent of their face value. We found that testimony unpersuasive and of no value. Insofar as the record shows, the only information which petitioner's expert witness had as to the new Henry Grady was obtained from profit and loss statements and balance sheets that are in the record in this case without any explanation of the underlying data from which they were computed. This witness pointed to the current asset position as of June 30, 1960, as compared to current liabilities as bearing greatly on his judgment of the financial situation of the new Henry Grady. The record shows that as of January 31, 1958, which was only a few months after the new Henry Grady bought the old Henry Grady stock and assumed the notes here involved, the ratio of current assets to current liabilities of the new Henry Grady was less than it was on June 30, 1960. From the record we must conclude that this fact, if it were approximately the same for the old Henry Grady prior to the 1957 stock purchase, did not deter persons of knowledge and experience in hotel operations from investing in the Henry Grady stock. The witness offered *229 no explanation in this regard. Petitioner's witness did not know the fair market value of the fixed assets of the new Henry Grady which were the major portion of the corporate assets. He assumed that since the new Henry Grady acquired these assets in August 1957, they would, on June 29, 1960, not be worth substantially more than their book value. Why an assumption of no increase in value of assets would be any more reasonable than would an assumption of no decrease in value of the installment notes during this period, the witness did not explain. Neither did the witness explain or show any knowledge of how the book value of the assets to the new Henry Grady was determined. This witness apparently gave no consideration to the overall earnings record of the corporation or to any of the other elements which should be considered in properly evaluating the fair market value of the installment notes. This witness made no mention of whether the limited guarantee of William J. Friedman and Julius Epstein of the notes which was given to Phoenix, Inc., at the time the new Henry Grady was substituted as obligor on these notes would in his opinion affect the value of these notes. At the trial *230 petitioner's counsel suggested that this guarantee was not an assignable one under Georgia law, but petitioner did not restate this position on brief or make any argument in this respect. We hold that petitioner had a gain under section 453(d)(1) of the difference between its basis in the installment notes and an amount computed by taking 66 percent of the face amount of the installment notes transferred to Kennesaw for this right. This gain is, as determined by respondent, a long-term capital gain. Decision will be entered under Rule 50. Footnotes
1. This is taken from the stipulation which does not explain why the total payment is $62,500 instead of $60,000.↩
2. SEC. 453(d)(1) General rule. - If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and - (A) the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or (B) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange. Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received. ↩
3. Petitioner, on its return, recognized that it made a disposition of the installment obligations but treated the transaction as a tax-free exchange of property for stock on which gain was not required to be recognized under the provisions of sec. 368(a)(1)(C), I.R.C. 1954. Whether petitioner would have been correct in its appraisal of the transaction if the transfer had not been to a life insurance company is not at issue in this case. Sec. 453(d)(5)↩ specifically provides that where a transfer of an installment obligation is to a life insurance company by a person other than another life insurance company, the nonrecognition of gain provisions are not applicable. In this case petitioner does not contend in view of this provision that the transfer of the installment obligations to Kennesaw was in a transaction on which gain is not recognized.