WHITE FARM EQUIPMENT COMPANY, A DELAWARE CORPORATION (SUCCESSOR TO OLIVER CORPORATION, A DELAWARE CORPORATION), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

AMERADA HESS CORPORATION, SUCCESSOR BY MERGER OF HESS OIL AND CHEMICAL CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4792–69, 5842–70, 1367–71.    Filed November 14, 1973.

*Andre M. Saltoun, Dennis I. Meyer,* and *Neal J. Block,* for the petitioner in docket No. 4792–69.

*Norman Sinrich, Burton G. Lipsky,* and *Harvey Blitz,* for the petitioner in docket Nos. 5842–70 and 1367–71.

*Charles B. Wolfe, Jr.,* for the respondent.

FORRESTER, *Judge:* Respondent has determined the following income tax deficiencies:

| Petitioner | Docket No. | Taxable year | Amount |
|---|---|---|---|
| White Farm Equipment Co. | 4792–69 | 11/1/60– 12/31/60 | $73,300.08 |
| | | 1961 | 9,354,720.80 |
| | | 1962 | 2,587,197.45 |
| Amerada Hess | 5842–70 | 1964 | 1,687,232.00 |
| | 1367–71 | 1965 | 1,541,601.00 |

In docket No. 1367–71 petitioner Amerada Hess has claimed an overpayment of income tax in the amount of $2,300,554. The issue for our decision is the valuation of 655,000 shares of White Motor Co. common stock which formed part of the consideration in an exchange in 1960 between predecessors of the petitioners.

FINDINGS OF FACT

Some of the facts are stipulated and are so found.

The original petitioner in docket No. 4792–69 was Oliver Corp. (New Oliver), a Delaware corporation whose principal office was in Chicago, Ill., at the time its petition herein was filed. New Oliver's Federal income tax returns for the period from November 1, 1960, to December 31,

1960, and for the taxable years 1961 and 1962 were timely filed using an accrual method of accounting with the district director of internal revenue in Chicago, Ill.

Throughout the period from November 1, 1960, to December 31, 1962, New Oliver was a wholly owned subsidiary of White Motor Corp. (formerly White Motor Co., hereinafter referred to as White Motor). In October 1969 New Oliver was merged into Minneapolis Moline, Inc., also a Delaware corporation, which shortly thereafter changed its name to White Farm Equipment Co. (White). White is the successor to the rights, assets, and liabilities of New Oliver, and is a wholly owned subsidiary of White Motor. At the time White filed an amended petition its principal place of business was in Hopkins, Minn.

Amerada Hess Corp. (Hess), petitioner in docket Nos. 5842–70 and 1367–71, is a Delaware corporation with its principal office in Woodbridge, N.J. Hess is the surviving corporation of a merger on June 20, 1969, between Hess Oil & Chemical Corp. and Amerada Petroleum Corp. Hess Oil & Chemical Corp. timely filed its Federal income tax returns for the taxable years 1964 and 1965 on the accrual method of accounting with the district director of internal revenue in Newark, N.J. Hess Oil & Chemical Corp. was the surviving corporation of a merger on May 23, 1962, between Cletrac Corp. and Hess, Inc., and affiliated companies. Prior to October 31, 1960, Cletrac Corp.'s corporate name had been the Oliver Corp. (Old Oliver).

From 1929 until October 31, 1960, Old Oliver was engaged primarily in the farm equipment business. Beginning in 1944 Old Oliver also manufactured and sold crawler tractors for both agricultural and industrial purposes. It marketed its farm equipment throughout the world and in 1959 its sales volume ranked seventh among all farm equipment manufacturers.

Old Oliver's common stock was listed on the New York Stock Exchange, and throughout the period from 1951 to 1960 it traded at prices substantially below pro rata book value.

For several years prior to 1960 Old Oliver had been actively investigating the possibility of a merger or a substantial sale of assets. Its management was dissatisfied with recent earnings performance, but was convinced that to substantially improve earnings would be a lengthy task. Many of its management practices and policies were being questioned, and the continuity of its management was doubtful because of age. It was also having difficulty in financing the research and development activity necessary to maintain its farm equipment products in a competitive position with its industrial rivals. Because of the recent bankruptcy of another farm equipment manufacturer, lending institutions and the financial markets in general were guarded in their appraisal of the farm equipment industry.

In late 1959 Old Oliver and Studebaker-Packard reached a tentative agreement on a major exchange of assets. However, the proposed exchange did not receive the approval of Studebaker-Packard's board of directors and the negotiations were terminated in January 1960. During 1959 and 1960 Old Oliver also held talks regarding a possible major exchange with representatives of Minneapolis-Moline Co., another manufacturer of farm equipment.

In March 1960 Old Oliver contacted White Motor about a possible sale of all the assets comprising its farm equipment business except cash and accounts receivable. White Motor was primarily engaged in the manufacture, sale, and servicing of large motortrucks. Based on new truck registrations in the United States in 1959, White Motor ranked third in the number of trucks in the classification of 19,501 pounds or more gross vehicle weight. Its principal competitors were Mack Trucks, Inc., General Motors Corp., Ford Motor Co., Chrysler Corp., and International Harvester Co. White Motor also sold trucks in Canada and 68 other foreign countries. White Motor expressed an interest in acquiring Old Oliver's farm equipment business as a complement to its existing business and the two companies entered serious negotiations.

The principal negotiators were A. L. Mailman (Mailman) for Old Oliver and J. P. Dragin (Dragin) for White Motor. Mailman had considerable experience in negotiations of this type, having represented himself or others in the purchase or sale of assets or businesses on approximately 50 occasions. A number of these transactions involved assets worth $30 to $50 million. He had been a partner in Mailman Brothers, a private investment firm, since 1932, and was a member of Old Oliver's board of directors. In addition he controlled a substantial block of Old Oliver's outstanding stock.

In 1960 Old Oliver had approximately 2,575,000 shares of common stock outstanding. On October 31, 1960, Mailman and his brother, J. L. Mailman, their wives, and companies they controlled held 209,-848 shares of such stock. In addition, 114,508 shares were held in trust by other individuals for the benefit of the Mailman family. The 324,-356 shares held by or for the Mailman group constituted the largest block of Old Oliver stock held by any one group.

In 1960, Dragin was White Motor's executive vice president for finance and administration and was a certified public accountant. He had previously participated in a number of asset acquisitions by White Motor, and had known Mailman in a business relationship for a number of years.

At their first meetings in March 1960, Mailman informed Dragin that Old Oliver preferred to sell its farm equipment business for cash.

It was soon clear, however, that White Motor could not raise nearly enough cash, and that the major part of the consideration would have to be White Motor stock and securities. It was also understood from early on in the negotiations that White Motor would not acquire Old Oliver's cash, accounts receivable, or liabilities.

At no point during any of their negotiations did Dragin and Mailman ever discuss the value to be placed on White Motor's common stock for accounting or for tax purposes.

Further discussions between Dragin and Mailman took place in April, May, and June. During this period Dragin made a physical examination of the five plants to be purchased from Old Oliver and reviewed pictures, descriptions, and reports prepared by his staff relating to the assets to be purchased. He also engaged Sidney Kriser (Kriser), an expert auctioneer and appraiser of industrial property, to prepare a liquidating appraisal of a large portion of these assets. Kriser visited the plants and submitted a report to Dragin wherein he appraised the liquidating value of the real estate at $2,950,000, and the machinery and equipment at $4,800,000. The book value of these assets at the time of appraisal was $3,519,000 and $7,960,000, respectively.

On June 16, 1960, White Motor's executive committee voted to submit to its board of directors a proposal to purchase the assets comprising the farm equipment business of Old Oliver. An outline of the terms of this proposal was stated in a letter from Dragin to Mailman dated June 17, 1960. The letter contained the following tentative description of how White Motor proposed to pay for Old Oliver's farm equipment business:

The purchase price is to be an amount equal to the aggregate sum of the book value (after depreciation) of the fixed assets to be sold plus the book value (on the LIFO basis and after deducting the reserve for obsolescence) of the inventory to be sold, less 20% of the aggregate sum of the book value of said fixed assets and of said inventory determined as aforesaid. It is to be understood that the payment of the aforesaid purchase price shall entitle The White Motor Company to the exclusive use of the names "The Oliver Corporation" and "Oliver International S. A." * * * The purchase price is to be paid (a) by the delivery of five hundred thousand (500,000) shares of Common Stock of The White Motor Company, to be considered as having a value of Twenty-five Million Dollars ($25,000,000), and (b) the balance of the purchase price is to be paid in cash or in debentures at par * * *

* * * * * * *
The closing of the transaction is to take place on October 31, 1960, or as soon thereafter as practicable * * *

* * * * * * *
The White Motor Company has to arrange financing satisfactory to its Board of Directors before some of the provisions of the contemplated contract can be agreed upon. * * *

This proposal was approved by White Motor's board of directors on June 22, 1960, with the following resolution:

RESOLVED, That the terms of the proposed transaction between the White Motor Company and the Oliver Corporation stated in Mr. Dragin's letter of June 17, 1960 to Mr. A. L. Mailman, subject to the other terms and provisions of a contract between the two companies being worked out to the satisfaction of both companies and subject also to The White Motor Company's being able to make financial arrangements satisfactory to the Board of Directors, be and hereby is approved, and that the officers of the Company be and hereby are authorized to proceed to attempt to make such satisfactory financial arrangements.

Old Oliver's board of directors considered the proposal set forth in Dragin's June 17 letter at a special meeting on June 23, 1960. The following resolution was adopted after the proposal was discussed:

RESOLVED that Alva W. Phelps and A. L. Mailman be, and they hereby are, authorized to continue negotiations with The White Motor Company for the sale of certain assets of the Company to The White Motor Company on the basis of the letter dated June 17, 1960, from J. P. Dragin, Executive Vice President of The White Motor Company, to A. L. Mailman, except that instead of a portion of the purchase price being paid by 500,000 shares of The White Motor Company common stock valued at $50 per share, a portion shall be paid by one share of The White Motor Company's common stock for each five shares of The Oliver Corporation's outstanding common stock (including that under option), which payment shall be valued on the basis of the closing market price of The White Motor Company stock on June 23, 1960.

White Motor's common stock closed at $48.50 on the New York Stock Exchange on June 23, 1960.

During June and July of 1960, Dragin sought to arrange the financing which White Motor needed in order to execute its part of the proposed exchange. In addition to the potentially large sum of cash which was called for by the June 17 proposal, White Motor also needed to raise $20 million in working capital because it was not acquiring Old Oliver's cash or accounts receivable. Dragin encountered great difficulties in arranging the requisite financing.

On August 1, 1960, White Motor's board of directors decided that the company should not enter into the proposed exchange with Old Oliver unless satisfactory financing could be arranged. Further negotiations were held during August and a number of alternatives were proposed to lessen White Motor's financing difficulties. The upshot of these discussions was an agreement (1) to increase to 655,000 the number of shares of common stock which White Motor would transfer to Old Oliver and (2) to decrease the amount of cash which White Motor might have to pay to adjust for Old Oliver's closing inventories. The assigned value of $48.50 per share of White Motor common stock was retained.

On September 22, 1960, Dragin informed the board of directors of White Motor that arrangements to provide the necessary financing

were nearly completed. Such arrangements were subsequently approved by the board of directors on September 30, 1960, and a formal loan agreement was later executed on October 4, 1960, under which White Motor borrowed $20 million from a group of insurance companies.

In September 1960, White Motor's board of directors resolved to hold a special shareholder meeting on October 31, 1960, for the purpose of considering and acting on the proposed acquisition of the Oliver farm equipment business. A draft of the proxy statement to be sent to White Motor's shareholders prior to the October 31 meeting was prepared in early September and routinely submitted to the United States Securities and Exchange Commission for its comments. The draft of the proxy statement included a pro forma balance sheet projecting White Motor's financial position after the proposed acquisition of Old Oliver's farm equipment business. The assets to be acquired from Old Oliver were recorded on the pro forma balance sheet at a cost which was based on their net book value but which was then adjusted downward by a total of more than $10 million. This downward adjustment was explained by the following footnote:

(2) These amounts represent the excess of Oliver book value over White acquisition cost. The amount of excess will be adjusted for the difference between the assigned value of $48.50 per share of White common stock and its market value on the closing date.

The pro forma balance sheet also contained the following footnote explaining the entry in the capital stock account:

(3) Issuance of 655,000 shares of common stock at an assigned value of $48.50 per share, or an aggregate of $31,767,500, of which the sum of $1.00 per share is credited to the common stock account and the sum of $47.50 per share is credited to capital in excess of par value of capital stock. The aggregate credit to capital in excess of par value of capital stock of $31,112,500 is subject to a decrease or an increase in the same amount as the adjustment to the excess referred to in Note C (2) above.

The pro forma balance sheet in the draft of the proxy statement also reflected the financing arrangements which had been made to provide White Motor the working capital it would need to conduct the Oliver farm equipment business. A footnote to the cash and notes payable accounts also predicted that the cash payment to Old Oliver would decrease as follows:

(1) Issuance of long-term notes payable to insurance companies amounting to $20,000,000 and cash payment of $9,045,000 to Oliver. If the inventories decrease between July 31, 1960 and October 31, 1960 * * * the cash payment required to be made by White to Oliver will decrease by 80% of such decrease in the book value of the inventories. Based on the decrease in inventories during the period from July 31, 1959 to October 31, 1959 it is estimated that the cash payment will be decreased by $3,760,000.

A copy of this pro forma balance sheet together with the footnotes was reviewed by Dragin and other top White Motor officials before it was submitted to the SEC. These footnotes appeared again in identical form in the final proxy statements which were distributed to White Motor's shareholders on October 10, 1960.

On September 30, 1960, the SEC responded to White Motor's preliminary proxy in a letter which included the following comment:

Paragraph (a) on page 3 should specifically state whether any adjustment will be made at the closing date to reflect changes in the market price of White's stock in determining the value of the 655,000 shares to be issued. The closing date should be given, and if as it appears, no adjustment for changes in the market price is to be made, it should be stated that the 655,000 shares are being issued on the basis of $48.50 per share whereas the market price on _____ (latest practicable date) was $_____ per share.

The following language was included in the final proxy statement sent to White Motor's shareholders, but was not included in the draft of the proxy statement prepared in September:

No adjustment in the number of shares of the White Company Common Stock to be issued as hereinabove provided will be made on account of changes in the market price of Common Stock of the White Company. (The 655,000 shares of Common Stock of the White Company to be issued as hereinabove provided are to be issued on the basis of $48.50 per share, whereas the last sale on the New York Stock Exchange on October 3, 1960, was at the price of $42.375 per share.)

White Motor's proxy statements described the factors giving rise to the purchase price of the assets acquired by White Motor and the value of the White stock to be exchanged, as follows:

The provisions of the proposed contract between The Oliver Corporation and the White Company were determined by arms [sic] length bargaining between the officers and representatives of the two corporations. Factors which were considered in the negotiations and which resulted in the determination of the purchase price of the property and assets of The Oliver Corporation to be purchased by the White Company were the earnings records of the White Company and of The Oliver Corporation's farm equipment business, the values of the properties and assets to be purchased by the White Company, the value of the Common Stock of the White Company, the respective prices at which the Common Stocks of the two corporations have been selling over a period of five years last past, and the prospects and potentialities of the farm equipment business and of the other businesses of The Oliver Corporation, and of the businesses of the White Company.

The proxy statement sent to the shareholders was accompanied by a letter from White Motor's president recommending that the shareholders approve the proposed agreement with Old Oliver and including the following passage:

Under the terms of the contract and based on July 31, 1960 figures, The White Motor Company would acquire inventories, fixed assets and certain other assets

having a book value on the books of The Oliver Corporation (after deduction of a LIFO reserve on inventories in the sum of $7,733,000) of $51,410,000. In payment for these assets, The White Motor Company would issue 655,000 shares of its Common Stock, which had a market value on October 3, 1960, of $42.375 per share, or an aggregate of approximately $27,750,000, and make a cash payment estimated not to exceed approximately $9,000,000. * * *

Dragin reviewed both the final proxy statement and the letter to the shareholders.

In a press release dated October 6, 1960, White Motor announced its proposed agreement with Old Oliver and made the following statements:

Under the terms of the contract and based on July 31, 1960 figures, The White Motor Company would acquire inventories, fixed assets and certain other assets having a book value on the books of The Oliver Corporation (after deduction of a LIFO reserve on inventories in the sum of $7,733,000) of $51,410,000. In payment for these assets, The White Motor Company would issue 655,000 shares of its common stock, which had a market value on October 3, 1960, of approximately $27,750,000, and make a cash payment estimated not to exceed $9,000,000.

At a meeting in early October 1960, Old Oliver's board of directors authorized its officers to execute the proposed agreement to sell its farm equipment business to White Motor, subject to a vote of approval from its shareholders at a special meeting called for October 31. Pursuant to a requirement in the proposed agreement, the board further resolved to change the name of Old Oliver to Cletrac Corp., also subject to a shareholder vote.

The proxy statements which Old Oliver sent to its shareholders prior to the October 31 meeting included the following language in respect of the value to be placed on the block of White Motor common stock:

The price for the inventories, fixed assets and prepaid items will be paid first, in 655,000 shares of common stock of White, which for this purpose are taken at $48.50 per share, or an aggregate of $31,767,500. Fluctuations in the market value of White common stock prior to the Closing Date will not change the agreed valuation of $48.50 per share. At September 26, 1960, the closing market price of White common stock was $41 per share and the aggregate value of 655,000 shares was $26,855,000, which was $4,912,500 less than the assigned value. * * *

     *       *       *       *       *       *       *

Oliver is informed by its attorneys that the sale of assets to White is a taxable transaction to Oliver, and that gain or loss will result to Oliver in the amount of the difference between the cash plus the value of the White stock received and the income tax basis of the property sold. * * *

     *       *       *       *       *       *       *

A decline in the value of the White common stock prior to the Closing Date will increase the loss on the sale. This increase in loss would amount to $4,912,500 if that value were the closing market price of White common stock on Septem-

ber 26, 1960. In addition, as indicated on page 4, the Closing Date may be a date later than October 31, 1960. Oliver makes no representation as to what the market value of White common stock will be at the Closing Date.

Also included in this proxy statement was the following passage:

The Agreement with White requires Oliver to dispose of the common stock of White received by Oliver, and until it is disposed of, such stock will be held by The Cleveland Trust Company in trust under the terms of the Trust Agreement attached hereto as an exhibit.

Oliver is applying to the Internal Revenue Service for a ruling to the effect that if Oliver distributes pro rata to its stockholders the 655,000 shares of stock of White, the receipt of common stock of White by the Oliver stockholders will be taxable as a capital gain or loss as if each Oliver stockholder had sold a portion of his Oliver stock, and that the distribution will not be taxable as an ordinary dividend. If a favorable ruling is obtained, the common stock of White will be distributed pro rata to the Oliver stockholders in exchange for a portion of the common stock of Oliver. The Agreement provides that if a favorable tax ruling is received, Oliver will so distribute the common stock of White within two months of receipt of the ruling or seven months after the Closing Date, whichever is later. The method of disposition of the White common stock may require approval by the stockholders of Oliver.

If a favorable ruling is not received, some other method of disposal of the White stock will have to be adopted. The Trust Agreement provides that Oliver may cause the common stock of White to be distributed pro rata to its stockholders or sold in transactions where no more than 10,000 shares of common stock of White is sold to any one person. * * *

In a press release dated October 6, 1960, Old Oliver made the following statements in respect of the proposed exchange with White Motor:

Under the terms of the agreement and based on July 31, 1960 figures, White would acquire inventory, fixed assets and certain other assets having a book value on the books of Oliver (after a deduction of a LIFO reserve on inventory in the amount of $7,733,000) of approximately $51,410,000. In payment for these assets, White would issue to Oliver 655,000 shares of its common stock which had a market value on October 3, 1960 of $27,750,000 and make a cash payment estimated at not to exceed $9,000,000. The cash payment will depend on changes in inventory levels of Oliver between July 31, 1960 and the closing date, which is expected to be October 31, 1960. If the inventories of the farm equipment business of Oliver declined between July 31, 1960 and October 31, 1960 by the same amount as they did during the same period during 1959, the estimated cash payment of $9,000,000 would be reduced by approximately $3,760,000.

*  *  *  *  *  *  *

Oliver will distribute the White common stock to Oliver's shareholders on a pro rata basis, in exchange for a portion of the common stock of Oliver, subject to receipt of a ruling from the Internal Revenue Service that such a distribution will not be taxable as a dividend. If a favorable tax ruling is received, Oliver will distribute the common stock of White within two months of receipt of the ruling or seven months after the closing date, whichever is later.

Oliver will change its name to Cletrac Corporation.

On October 3, 1960, the officers of Old Oliver and White Motor formally executed a written agreement (agreement) defining the terms

of the proposed sale of the Oliver farm equipment business to White Motor, subject to the approval of the shareholders of both corporations. The requirement of shareholder approval was expressed in the agreement as follows:

38. The obligations of the parties hereto to carry out this Agreement are subject to the express condition that the holders of at least a majority of the outstanding shares of the capital stock of the Oliver Corporation shall * * * have voted in favor of the proposal * * * and to the express condition that the shareholders of the White Company * * * shall have approved this Agreement by a majority of the votes cast on the proposal * * * and that the total vote cast on the proposal represents over fifty per cent (50%) of the combined voting power of the Preferred Stock and Common Stock of the White Company * * *

At their respective meetings on October 31, 1960, the shareholders of Old Oliver and White Motor approved the agreement.

The assets comprising the farm equipment business to be transferred from Old Oliver to White Motor were enumerated in paragraph 6 of the agreement, which provided, in pertinent part, as follows:

6. Subject to the conditions herein set forth, The Oliver Corporation agrees to sell and transfer to the White Company, and the White Company agrees to purchase from The Oliver Corporation, all of the following described properties and assets of The Oliver Corporation as of the close of business on the Closing Date, to wit:

(a) All of the inventories (including raw materials, materials in process of manufacture, finished products, spare parts and supplies) owned by The Oliver Corporation and held for sale or use in connection with its farm equipment business * * *

(b) All land and appurtenances thereto, buildings, building fixtures and tangible personal property other than inventories, owned or used by The Oliver Corporation in connection with its farm equipment business * * * and all machinery, equipment, jigs, dies, production fixtures, other tools, patterns, drawings, vehicles, and furniture located at said plants or used in connection with its farm equipment business.

(c) All branch real estate * * * which is held or used by The Oliver Corporation in connection with its farm equipment business, and all machinery, equipment, jigs, dies, production fixtures, other tools, patterns, drawings, vehicles, and furniture located at The Oliver Corporation's branches, which are held or used by The Oliver Corporation in connection with its farm equipment business, and all furniture and equipment at the home office of The Oliver Corporation.

(d) All books and records of The Oliver Corporation relating to its farm equipment business * * *

(e) All patents, applications for patents, inventions, discoveries, assignable patent licenses, contracts for the payment of royalties to The Oliver Corporation, copyrights, trademarks and trade names owned by The Oliver Corporation and pertaining to or useful in or in connection with its farm equipment business * * *

(f) All good will connected with the farm equipment business of The Oliver Corporation, including, but not limited to, all rights possessed by The Oliver Corporation in and to the name "Oliver."

(g) All of the right, title and interest of The Oliver Corporation in and to contracts made or orders given by The Oliver Corporation in the usual and normal course of business for the purchase by The Oliver Corporation of

materials, parts and factory supplies for use in the manufacture, sale or servicing of farm equipment.

(h) All of the right, title and interest of The Oliver Corporation in and to contracts made or orders received by The Oliver Corporation in the usual and normal course of business for servicing, not completed at the close of business on the Closing Date, of farm equipment, and for the sale by The Oliver Corporation and delivery after the close of business on the Closing Date of farm equipment * * * and in and to deposits of money or other property made by customers on the contracts or orders hereinabove in this subparagraph (h) described, or any of them.

(i) All of the right, title and interest of The Oliver Corporation in and to the leases of real estate listed in Exhibit E, hereunto attached and made a part hereof, provided that The Oliver Corporation obtains the consent of the respective Lessors where necessary.

(j) The following prepaid items and supplies to the extent that they relate to the assets to be purchased by the White Company under the foregoing subparagraphs (a), (b), (c), (d), (e), (f), (g), (h), and (i) of this paragraph 6:

Merchandising Items

Stationery and Office Supplies

Repair Parts Catalogues

Prepaid Insurance to the extent the insurance is transferable

Costs for Production Tooling

Uncompleted Fixed Assets

Freight and Express Clearings (Collectible Claims)

Postage Stamps and Deposits

Other Prepaid Factory Expenses

Other Prepaid Branch Expenses

Other Prepaid Executive Office Expenses

Except as otherwise provided in options to be granted to the White Company as in this Agreement provided, it is understood and agreed that the properties and assets to be sold to the White Company under this Agreement shall not include any cash, securities or notes or accounts receivable owned by The Oliver Corporation * * * nor its crawler tractor business, as defined in the Option Agreement, a copy of which, marked Exhibit F, is hereunto attached and made a part of this Agreement * * * nor any property or asset not described in subparagraphs (a), (b), (c), (d), (e), (f), (g), (h), (i), and (j) of this paragraph 6 or in paragraphs 11, 12 and 21 of this Agreement. The phrase "farm equipment business," as used in this Agreement, means the manufacture and sale of products of the type produced in The Oliver Corporation's Battle Creek, Michigan, #1 plant, its Charles City, Iowa, plant, its Shelbyville, Illinois, plant and its South Bend, Indiana, #1 plant, and does not include the manufacture or sale of crawler tractors and allied equipment.

The price which White Motor was required to pay for the farm equipment assets was to be computed in accordance with paragraph 7, which provided, in pertinent part, as follows:

7. Subject to the conditions in this Agreement set forth, the White Company agrees to pay to The Oliver Corporation for all of the properties and assets hereinabove described in subparagraphs (a), (b), (c), (d), (e), (f), (g), (h), and (i) of paragraph 6 of this Agreement, a sum which is equal to the sum of fifty per cent (50%) of the book value, at the close of business on the Closing Date, of the closed South Bend Foundry, plus eighty per cent (80%) of the book value, at the close of business on the Closing Date, of the inventories and, except the closed South Bend Foundry, of the land, land improvements,

buildings and improvements, railroad sidings, machinery and equipment, furniture and fixtures, dies, jigs, fixtures, material handling equipment, patterns, flasks, automobiles, trucks, tractors and other additions in process, purchased by the White Company from The Oliver Corporation under the provisions of this Agreement. * * *

Subject to the conditions in this Agreement set forth, the White Company shall pay the following prices for the prepaid items and supplies described in subparagraph (j) of said paragraph 6, except that the White Company shall not pay any amount for any prepaid item which is applicable to periods of time prior to the close of business on the Closing Date:

Stationery and Office Supplies and Repair Parts Catalogues: fifty per cent (50%) of book value of the inventory at the close of business on the Closing Date;

Freight and Express Clearings (Collectible Claims), Postage Stamps and Deposits, Merchandising Items and Prepaid Insurance: one hundred per cent (100%) of book value at the close of business on the Closing Date;

Costs for Production Tooling, Uncompleted Fixed Assets, Other Prepaid Factory Expenses, Other Prepaid Branch Expenses, Other Prepaid Executive Office Expenses, as follows: one hundred per cent (100%) of book value at the close of business on the Closing Date, if chargeable to customers or vendors, eighty per cent (80%) of such book value if the items are to be capitalized, and one hundred per cent (100%) of book value if the items are cash items.

The White Company shall purchase such prepaid items and supplies only to the extent that they relate to the farm equipment business * * *

Paragraph 8 set forth the method by which White Motor would pay the purchase price and provided, in pertinent part, as follows:

8. The purchase price hereinabove provided for in paragraph 7 shall be paid as follows: The sum of Thirty-one Million Seven Hundred Sixty-seven Thousand Five Hundred Dollars ($31,767,500) shall be paid by the White Company by the delivery, on the Closing Date, to The Cleveland Trust Company, of Cleveland, Ohio, of certificates for six hundred fifty-five thousand (655,000) shares of the Common Stock of the White Company, made out and registered in the name of said The Cleveland Trust Company, or its nominee, to be held and disposed of by said Trust Company as provided in the Trust Agreement, a copy of which, marked "Exhibit G," is hereunto attached and made a part hereof, and The Oliver Corporation and the White Company each agrees on said Closing Date duly to execute said Trust Agreement. As soon as practicable after the Closing Date, the purchase price of the properties and assets described in subparagraphs (a), (b), (c), (d), (e), (f), (g), (h), (i), and (j) of paragraph 6 of this Agreement, at the close of business on the Closing Date, shall be computed in the manner hereinabove in paragraph 7 provided, and thereupon the White Company shall forthwith pay to The Oliver Corporation the unpaid balance, if any, of said purchase price, as so computed, by check payable to the order of The Oliver Corporation. If the said computation shall show that the purchase price is less than Thirty-one Million Seven Hundred Sixty-seven Thousand Five Hundred Dollars ($31,767,500), The Oliver Corporation shall forthwith pay to the White Company by The Oliver Corporation's check the difference between the said purchase price and the said sum of Thirty-one Million Seven Hundred Sixty-seven Thousand Five Hundred Dollars ($31,767,500). If the determination of the said purchase price has not been made by the Seventy-fifth day after the Closing Date, then a payment shall be made on the Eightieth day after the Closing Date, by the White Company or The Oliver Corporation, as the case may be, based on all amounts not in dispute and the payment of any disputed amounts

thereafter determined to be due shall be made forthwith upon the resolution of the disputes.

The agreement also provided that White Motor would purchase Old Oliver's interest in two foreign subsidiaries, Oliver International, S.A., and the Oliver Corp., Argentina, S.A. The relevant language read as follows:

11. The Oliver Corporation agrees to sell and transfer to the White Company on the Closing Date all of the outstanding capital stock of Oliver International, S.A., and the White Company agrees to pay therefor as provided in this paragraph 11. The White Company will pay to The Oliver Corporation a sum equal to eighty per cent (80%) of the book value (after depreciation) at the close of business on the Closing Date of the machinery, equipment, jigs, dies, production fixtures, other tools, patterns and furniture, owned by Oliver International, S.A. * * *

12. The White Company agrees to purchase from The Oliver Corporation, and The Oliver Corporation agrees to sell to the White Company, all of the outstanding capital stock of The Oliver Corporation, Argentina, S.A. for a price equal to the cash held by said The Oliver Corporation, Argentina, S.A. at the close of business on the Closing Date, and uncollected royalties receivable from La Cantabrica, S.A. an Argentine corporation, with respect to sales made prior to the close of business on the Closing Date less the obligations of The Oliver Corporation, Argentina, S.A., at the close of business on the Closing Date. * * *

Old Oliver agreed to change its corporate name in the following provision:

24. The Oliver Corporation agrees to consent, on the Closing Date, to the use of the name "The Oliver Corporation," or any name including the word "Oliver," by the White Company or any subsidiary thereof, and promptly to change its own name to a name not containing the word "Oliver." * * *

The agreement expressly stated that it represented the entire agreement between the parties:

50. This Agreement contains the entire Agreement between the parties hereto with respect to the transactions herein contemplated, and supersedes all prior agreements or understandings between the parties hereto relating to the subject matter hereof. This Agreement is not made for the benefit of any person except the parties to this Agreement.

The block of 655,000 shares of common stock transferred pursuant to the agreement represented approximately 24 percent of the White Motor common stock outstanding after the exchange with Old Oliver was completed. Except for this block of shares, no shareholder or affiliated group of shareholders of White Motor owned as much as 10 percent of its voting stock. Although Old Oliver intended to distribute the White Motor common stock to its shareholders if favorable tax treatment could be assured, White Motor was still concerned about concentrating so many shares of its voting stock in one block. This concern caused White Motor to insist that the block of shares be delivered directly to a trust rather than to Old Oliver, and that the trust agreement be written to ensure a wide distribution of the stock. The

trust agreement which resulted from these demands included the following provisions:

WHEREAS, Oliver and White desire to create this Trust for the purpose of assuring that said shares of Common Stock of White (together with all additional shares of Common Stock of White, if any, which may be declared and paid as a dividend thereon) shall be either distributed to the shareholders of Oliver as hereinafter provided or sold in a public offering as hereinafter provided; and

\* \* \* \* \* \* \*

Upon written request of Oliver, the Trustee shall make available from time to time to Oliver all or any part of the shares of Common Stock of White hereinbefore referred to then held by the Trustee under this Agreement for either or both of the following purposes, but only for the following purposes, to wit:

(a) For distribution to Oliver's stockholders in proportion to their respective holdings of Common Stock of Oliver \* \* \*

\* \* \* \* \* \* \*

(b) For sale in a public offering under which the Trustee shall make delivery thereof to underwriters at the principal office of the Trustee, upon the written instruction of Oliver acknowledging receipt from the underwriters of the consideration to be paid by the underwriters therefor, subject to fulfillment of the following conditions, namely:

(i) Receipt by the Trustee at the time of such delivery of an executed copy of an underwriting agreement between Oliver and the underwriters, covering the shares of Common Stock of White to be delivered, which underwriting agreement shall contain a covenant on the part of the underwriters, reading substantially as follows:

"The Underwriters agree that if, during the distribution of said Common Stock, any Underwriter receives an order for more than 10,000 shares from any purchaser such Underwriter will notify the Representative of the Underwriters and the Representative will notify The White Motor Company of the receipt of such order and such Underwriter will not, without the approval of The White Motor Company, fill such order in excess of 10,000 shares."

\* \* \* \* \* \* \*

In case Oliver, within 32 months after the date of this Agreement, shall not have disposed of, as in this Agreement provided, all of the Common Stock of White held by the Trustee hereunder, White, at any time thereafter, may serve written notice on Oliver that White desires to have all of the said stock disposed of either by distribution to the stockholders of Oliver as hereinbefore provided, or by sale in a public offering as hereinbefore provided. \* \* \* Oliver shall be deemed to have authorized White to make such disposition as Oliver's agent. \* \* \*

\* \* \* \* \* \* \*

The Trustee, during the life of the Trust in this Trust Agreement set forth, shall have power and authority to collect and receive all dividends payable on the said Common Stock of White held by it, and promptly upon receipt thereof, shall remit said dividends to Oliver, provided, however, that any stock of White received by the Trustee by virtue of its record ownership of the Common Stock of White held by it hereunder shall be held and disposed of in the same manner as in this Trust Agreement provided with respect to the Common Stock originally deposited hereunder. \* \* \*

The trust agreement also provided an elaborate arrangement designed to ensure that during the term of the trust the trustee would vote the block of White Motor shares according to the instructions of Old

Oliver's shareholders rather than its board of directors. Concern about the size of the block of common stock also prompted White Motor to require inclusion of the following provision in the agreement itself:

39. The Oliver Corporation agrees, promptly after the execution of this Agreement, to prepare and file with the Internal Revenue Service a request for a ruling that distribution of the Common Stock of the White Company to be issued to The Cleveland Trust Company under the provisions of this Agreement, pro rata to the stockholders of The Oliver Corporation (but subject to adjustment by cash or scrip for fractional shares), will qualify as a partial liquidation of The Oliver Corporation and that the stockholders of The Oliver Corporation, upon their receipt of their respective shares of such stock of the White Company, will not be deemed to have realized distributions taxable as ordinary income. The Oliver Corporation agrees to use its best efforts to obtain such a ruling, and in the event such a ruling is received, The Oliver Corporation agrees to take all steps necessary to be taken by it to cause such distribution to its stockholders within two (2) months after receipt of such ruling, or seven (7) months after the delivery of such stock of the White Company to The Cleveland Trust Company, whichever is later.

Old Oliver and White Motor closed the agreement on October 31, 1960, after a vote of approval by the shareholders of both corporations. At the closing Old Oliver transferred the assets specified in the agreement to White Motor. Old Oliver's final book values for such assets were as follows:

I. Inventory:
On first-in first-out method.....................  $31, 745, 068
  Less:
  Accumulated adjustments to inventory to elective method (LIFO)...  $7, 301, 850
  Reserve for inventory adjustment...  665, 398  7, 967, 248

Net inventories................................................  $23, 777, 820
II. Fixed assets:
  A. Real estate and improvements:
    Plants................................  3, 698, 551
    Branches..............................  2, 861, 343

    Total real estate and improvements.............................  6, 559, 894
  B. Machinery and equipment:
    Plants................................  7, 755, 727
    Branches..............................  479, 462

    Total machinery and equipment.............  8, 235, 189
  C. Tooling:
    Plants................................  3, 905, 740
    Branches..............................  0

    Total tooling.............................  3, 905, 740
    Total fixed assets...........................................  18, 700, 823
  Prepaid items................................................  427, 120

    Total.....................................................  42, 905, 763

Also on October 31, 1960, White Motor delivered 655,000 shares of its common stock to the trustee in accordance with the trust provisions of the agreement. In addition, White Motor paid Old Oliver $1,508,550 in cash and assumed $281,396 in liabilities on the farm equipment assets transferred to it.

On November 1, 1960, White Motor transferred the Oliver farm equipment business which it had received under the agreement to New Oliver in exchange for New Oliver's common stock. New Oliver's tax basis in the farm equipment business on November 1, 1960, was the same as White Motor's tax basis.

Both White Motor and New Oliver initially recorded the acquisition of Old Oliver's farm equipment business at a total cost of $23,784,-687.50 on their books of account. This cost was derived by valuing the 655,000 shares of White Motor common stock at $36.3125 per share, the average price of White Motor common stock on the New York Stock Exchange on October 31, 1960.

White Motor's initial entries were reversed sometime in January 1961, before the books were closed for the calendar year 1960, and the final entries recorded the farm equipment business at a cost reflecting a value of $48.50 for each share of White Motor common stock. The initial entries were changed at the suggestion of White Motor's tax department and its independent certified public accountants. The following language is from a memorandum dated January 4, 1961, in the files of White Motor's accountants:

In Note C (2) of notes to the pro forma consolidated balance sheet included in The White Motor policy [sic (proxy)] statement of October 10, 1960, White stated that the stock issued in the acquisition would be recorded at market value on the closing date. The question was raised as to SEC's position as White records the stock at $48.50. * * * there should be no problem, and if a question is raised White could state that at the time of the policy [sic (proxy)] statement the values had not been determined, and that on advice of consul [sic] a statement was included in the proxy statement that the adjustment would be made to the market value. Subsequent to the date of the proxy statement consul [sic] has advised White that the $48.50 value per share is proper for both accounting and tax purposes.

New Oliver prepared its Federal income tax returns for 1960, 1961, and 1962, on the basis that the assets received under the agreement had been acquired in exchange for White Motor common stock having a value of $48.50 per share.

Old Oliver recorded the block of White Motor common stock on its books at a total value of $23,784,688, or $36.3125 per share. It also valued the stock at $23,784,688 in reporting a loss on the sale of its farm equipment business in its Federal income tax return for 1960.

On December 9, 1960, and again on March 23, 1961, Old Oliver requested a ruling from the Internal Revenue Service with respect to the

distribution of its 655,000 shares of White Motor common stock to its shareholders, and received favorable rulings. Pursuant to a plan of partial liquidation adopted by its shareholders on June 30, 1961, approximately 653,770 shares of the block of 655,000 shares were either distributed directly to the Old Oliver shareholders or sold on the market and the proceeds made available to the shareholders. The remainder of approximately 1,230 shares of White Motor common stock not so distributed or sold was held by Old Oliver as an investment.

White Motor common stock had been listed on the New York Stock Exchange for many years prior to October 31, 1960. On October 31, 1960, immediately prior to the issuance of the block of 655,000 shares of White Motor common stock, White Motor had outstanding 2,112,157 shares of common stock and 55,108 shares of $100 par value preferred stock. During the years 1959, 1960, and 1961, the number of White Motor common shares traded on the New York Stock Exchange totaled 472,500, 444,000, and 622,600, respectively. The trading volume in White Motor common stock on the New York Stock Exchange over the first 10 months of 1960 was reported as follows:

| Month | Volume of shares traded | Month | Volume of shares traded |
|---|---|---|---|
| January | 25,500 | June | 48,800 |
| February | 31,900 | July | 26,200 |
| March | 46,900 | August | 25,200 |
| April | 30,900 | September | 31,100 |
| May | 36,000 | October | 34,100 |

The average monthly trading volume over this period was approximately 33,650. On October 31, 1960, 3,300 shares of White Motor common stock were traded on the New York Stock Exchange.

On October 31, 1960, the price of White Motor common stock on the New York Stock Exchange was at the lowest point it reached at any time during the 3 years 1959, 1960, and 1961. The monthly trading highs and lows of White Motor's common stock on the New York Stock Exchange during these 3 years were as follows:

| Month | 1959 | | 1960 | | 1961 | |
|---|---|---|---|---|---|---|
| | High [1] | Low [1] | High | Low | High | Low |
| January | 37.14 | 32.14 | 67.750 | 58.250 | 50.875 | 40.250 |
| February | 40.60 | 33.93 | 62.500 | 53.500 | 55.750 | 47.500 |
| March | 40.95 | 38.10 | 62.250 | 50.750 | 53.750 | 51.250 |
| April | 48.33 | 38.81 | 55.250 | 46.500 | 57.750 | 52.750 |
| May | 49.76 | 42.14 | 50.000 | 45.000 | 59.750 | 52.750 |
| June | 55.48 | 48.09 | 52.000 | 46.250 | 60.500 | 55.250 |
| July | 57.14 | 53.33 | 47.500 | 41.500 | 57.500 | 51.750 |
| August | 55.71 | 49.05 | 47.750 | 43.375 | 57.500 | 52.500 |
| September | 55.00 | 46.67 | 45.000 | 39.625 | 53.125 | 48.500 |
| October | 57.26 | 51.90 | 42.625 | 36.000 | 52.500 | 45.500 |
| November | 59.76 | 56.43 | 39.750 | 36.750 | 51.875 | 45.500 |
| December | 66.75 | 60.50 | 43.000 | 37.000 | 54.625 | 50.625 |

[1] Adjusted to reflect 100-percent stock split in March 1959 and 5-percent stock dividend in January 1960.

The low price of White Motor common stock during October 1960 was due in part to an overall decline in the stock market. Factors causing the decline in the market were the poor performance of the national economy during the third quarter of 1960, and the uncertainty about the outcome of the upcoming presidential elections in November 1960.

OPINION

On October 31, 1960, White Motor purchased the farm equipment business of Old Oliver (including the Oliver trade name) in exchange for 655,000 shares of White Motor common stock (White stock), $1,508,550 in cash, and the assumption of $281,396 in liabilities. Old Oliver immediately changed its corporate name to Cletrac Corp., and on November 1, 1960, White Motor transferred the Oliver farm equipment business to its wholly owned subsidiary, New Oliver, in a nontaxable exchange. Petitioner White Farm Equipment Co. (White) is the successor-in-interest to White Motor and New Oliver, and petitioner Amerada Hess Corp. (Hess) is the successor-in-interest to Old Oliver.

We are asked to decide the value to be placed on the block of 655,000 shares of White stock for the purposes of (1) determining the extent of Old Oliver's original loss and Hess' carryover loss from the sale of the farm equipment business and (2) determining White's tax basis in the farm equipment business. Old Oliver's loss on the sale of its farm equipment business is measured by the excess of its adjusted basis over the sum of the money received plus the fair market value of other property (essentially the shares of White stock) received. Sec. 1001 (a) and (b).[1] White's basis in the farm equipment business is the cost of such property, cost being the amount paid for such property in cash or other property. Sec. 1012; sec. 1.1012–1(a), Income Tax Regs. Since "the amount paid" by White included "other property" (the shares of White stock) it is necessary to determine the value in dollars of that stock.

Hess has argued for a valuation of approximately $20 million (slightly more than $30 per share) in order to maximize its carryover loss, and White has argued for a valuation of $31,767,500 ($48.50 per share) in order to maximize its tax basis. Respondent is essentially a stakeholder in this case and his primary concern is that we deal consistently with both petitioners. On brief, however, respondent has supported the arguments made by Hess.

We hold that the value to be placed on the block of White shares is, as petitioner White has argued and as set forth by the parties in their agreement, $31,767,500 ($48.50 per share).

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise specified.

The agreement between White Motor and Old Oliver expressly stated that it represented the entire agreement between the parties as follows:

This Agreement contains the entire Agreement between the parties hereto with respect to the transactions herein contemplated, and supersedes all prior agreements or understandings between the parties hereto relating to the subject matter hereof. * * *

Payment of the assets purchased by White Motor was provided for in the agreement in pertinent part as follows:

7. * * * the' White Company agrees to pay to The Oliver Corporation for all of the properties and assets hereinabove described * * * *a sum which is equal to the sum* of [the various percentages of book value of the assets to be acquired] * * *

\* \* \* \* \* \* \*

8. The purchase price hereinabove provided for in paragraph 7 shall be paid as follows: *The sum of Thirty-one Million Seven Hundred Sixty-seven Thousand Five Hundred Dollars ($31,767,500) shall be paid by the White Company by the delivery, on the Closing Date * * * of certificates for six hundred fifty-five thousand (655,000) shares of the Common Stock of the White Company * * *.* As soon as practicable after the Closing Date, the purchase price of the properties and assets * * * shall be computed * * * and thereupon the White Company shall forthwith pay to The Oliver Corporation the unpaid balance, if any, of said purchase price, as so computed * * *. If the said computation shall show that the purchase price is less than Thirty-one Million Seven Hundred Sixty-seven Thousand Five Hundred Dollars ($31,767,500), The Oliver Corporation shall forthwith pay to the White Company by the Oliver Corporation's check the difference between the said purchase price and the said sum of Thirty-one Million Seven Hundred Sixty-seven Thousand Five Hundred Dollars ($31,767,500). * * *
[Emphasis supplied.]

It is clear from the foregoing provisions that the parties agreed that White Motor would pay the sum of $31,767,500 of the purchase price by the delivery of 655,000 shares of its common stock, thereby placing a value on the stock of $48.50 per share.

Assignments of value to property by parties with adverse interests in a transaction are regarded as strong evidence by the courts in determining fair market value of the property because fair market value by definition is "the price which property will bring when offered by a willing seller to a willing buyer, neither being obligated to buy or sell." *Elmhurst Cemetery Co.* v. *Commissioner*, 300 U.S. 37, 39 (1937); see *In Re Williams' Estate*, 256 F. 2d 217, 218 (C.A. 9, 1958), affirming a Memorandum Opinion of this Court.

In two cases strikingly similar to the instant case, *Moore-McCormack Lines, Inc.* (Mooremac), 44 T.C. 745 (1965), and its companion case *Seas Shipping Co., Inc.* (Seas), T.C. Memo. 1965–240, aff'd. 371 F. 2d 528 (C.A. 2, 1967), certiorari denied 387 U.S. 943 (1967), the issue before this Court was the valuation of $300,000 shares of Mooremac's

common stock given to Seas in partial payment for ships Mooremac purchased from Seas. The sales agreement assigned a value of $30 per share for purposes of satisfying the purchase price assigned to the ships. This Court in both cases held that the fair market value of the stock was $30 per share despite the fact that the stock traded for an average mean price of $22.81 on the New York Stock Exchange on the dates of sale. In *Seas Shipping Co.* v. *Commissioner*, 371 F. 2d 528 (C.A. 2, 1967), certiorari denied 387 U.S. 943 (1967), the Second Circuit affirmed this Court's valuation and stated at page 532:

In section 7(b) (5) of the sales contract, which provided for the release of consideration to Seas by the escrow agent as the ships were delivered, the parties themselves assigned a value of $30 per share to the stock. Where parties with adverse interests are at issue over the worth of property and then agree upon the dollar amount of that worth, the agreement is very persuasive evidence of value. *Ullman* v. *Commissioner of Internal Revenue*, 264 F. 2d 305, 308 (2 Cir. 1959).

Similarly, in *Southern Natural Gas Co.* v. *United States*, 412 F. 2d 1222 (Ct. Cl. 1969), the question before the court was the fair market value of stock transferred by a corporation to its creditors for services rendered. An agreement between the corporation and its creditors valued each share of stock at the equivalent of $90 worth of services rendered. Security analysts, however, testifying on behalf of the Government, valued each share of stock as low as $5. The court held that the best evidence of fair market value was the parties' agreement and accordingly valued the stock at $90 per share.

In *Estate of Gordon A. Stouffer*, 30 T.C. 1244 (1958), reversed on other grounds sub nom. *Commissioner* v. *Marshman*, 279 F. 2d 27 (C.A. 6, 1960), certiorari denied 364 U.S. 918 (1960), reversal disapproved *United States* v. *Davis*, 370 U.S. 65 (1962), the issue before this Court was the valuation of certain stock purchase options granted in a property settlement pursuant to a divorce. In determining the fair market value of the options this Court held the parties' agreed valuation of the options would control the Federal income tax consequences of the transaction, stating at page 1249: "if the parties placed a valuation on the stock and dealt in the stock at a valuation they fixed, the measure of * * * rights which were relinquished would be measured by that fixed value." In its holding, this Court quoted the following language from *Commissioner* v. *Patino*, 186 F. 2d 962 (C.A. 4, 1950), affirming 13 T.C. 816 (1949):

It is entirely proper for parties to a contract to make their own estimates of values; and if they are dealing at arms [sic] length and there is no reason to question the bona fides of the transaction, their valuations may be accepted as correct. * * *

Thus, it is well established that when a monetary value is assigned to property exchanged in an arm's-length transaction and such value

has economic significance in the transaction, the assigned value of the property is given great weight by the courts in determining the fair market value of the property. *Seas Shipping Co.* v. *Commissioner*, 371 F. 2d 528, 532 (C.A. 2, 1967); *Southern Natural Gas Co.* v. *United States, supra; Ullman* v. *Commissioner*, 264 F. 2d 305, 308 (C.A. 2, 1959), affirming 29 T.C. 129 (1957). Cf. *Paul A. Johnson*, 39 T.C. 473, 480, 481 (1962); *Aleda N. Hall*, 9 T.C. 53 (1947); *Hugh M. Matheson*, 31 B.T.A. 493 (1934), affd. 82 F. 2d 380 (C.A. 5, 1936).

The assigned valuation of the White stock in the agreement is accordingly given great weight in our determination of the fair market value of the stock because the record in the instant case clearly establishes that White and Old Oliver were knowledgeable parties with adverse interests who dealt at arm's length and that the assigned valuation had economic significance in the transaction.

Both White Motor and Old Oliver were publicly held companies with their stock listed on the New York Stock Exchange. White Motor was a leading manufacturer of trucks and Old Oliver was a leading manufacturer of farm equipment. In the negotiation both corporations were represented by sophisticated and experienced negotiators.

Mailman was Old Oliver's principal negotiator and a member of that corporation's board of directors. Since 1932 he had been a partner in Mailman Brothers, a private investment firm in New York City. Prior to the White negotiations he had represented parties in the purchase or sale of businesses or assets on approximately 50 occasions, including a number of transactions involving assets worth $30 to $50 million. Mailman also had a substantial personal interest in the instant transaction since he and his brother, their wives, and corporations they controlled were Old Oliver's largest shareholder group, owning in excess of 12 percent of its outstanding shares.

Dragin, White Motor's principal representative in the negotiations, was a certified public accountant and executive vice president of finance and administration of that corporation. He had previously participated in a number of asset acquisitions by White Motor. Mailman regarded Dragin's business acumen very highly describing him as "probably the most astute negotiator that I have run into a lifetime and a brilliant accountant."

The parties unquestionably had adverse interests in the transaction and their valuation of the stock had economic significance. A high valuation of the stock would favor White by requiring a lesser number of its shares to purchase the assets, whereas a low valuation would benefit Old Oliver by increasing the number of shares or amount of cash it would receive for its assets.

Hess argues that the stock valuation was not intended to place a fair market value on the stock because the transaction was essen-

tially an asset for stock exchange. It argues that the function of the valuation was solely to determine a cash adjustment necessary because of the fluctuations which would occur in Old Oliver's inventory prior to the actual sale. In support of this argument it cites *Luther Bonham,* 33 B.T.A. 1100 (1936), affd. 89 F.2d 725 (C.A. 8, 1937). In that case the taxpayer agreed to exchange 1 share of bank stock he held for either 4 shares of the stock of the acquiring corporation or $360 in cash, but each bank shareholder was required to take at least 3 shares of corporate stock and could not take more than $90 cash.

In holding that the agreement did not establish the fair market values of the stocks this Court stated at page 1105 :

While it might be argued that this stock was valued at $90 per share under the contract, it is apparent that that figure was used as the basis of exchange and not as an indication of fair market value at a given date. The contract did not give the petitioner the privilege of receiving $360 per share for his bank stock, but required him to accept a minimum of three shares of Northwest Bancorporation stock and a maximum of cash in the sum of $90. * * *

We reject Hess' contention that the sales agreement in the instant case did not place a value on the stock. The *Bonham* case is distinguishable because this Court recognized in that case that the $360 figure placed on each share of bank stock and the $90 figure placed on the corporate stock did not represent the parties' appraisal of their value. In fact, neither petitioner nor respondent in the *Bonham* case contended that the figures placed on the stocks in the contract represented the parties' appraisal of the fair market value of the respective stocks. The values placed on the shares were simply a technique for fixing the maximum portion of the consideration to be paid in cash for each share of bank stock.

In the instant case, it is clear that the value assigned the White stock represented the parties' appraisal of the fair market value of the shares. The parties explicitly valued the stock at $31,767,500 for the purpose of satisfying the agreed purchase price of the assets. Furthermore, the purchase price may have been greater or less than the agreed value of the stock. In the latter case, under the agreement Old Oliver would have been required to pay White the difference in cash. At trial Mailman admitted that inventory sales by Old Oliver could have caused this difference to be as much as $5 million. In such event Old Oliver would have purchased for cash over 100,000 shares of White stock at $48.50 per share. Given that possibility it seems clear that the parties equated the stock valuation with cash and that Old Oliver valued the White stock at least at $48.50 per share.

The facts noted above clearly establish that the valuation of the White stock was reached by knowledgeable parties through arm's-

length bargaining. That being so, Hess must offer "strong proof" in order to overcome that valuation.[2] Cf. *Ullman* v. *Commissioner*, 264 F. 2d 305 (C.A. 2, 1959); *Glen W. Lucas, Jr.*, 58 T.C. 1022, 1032 (1972); *Meyer Mittleman*, 56 T.C. 171, 177 (1971), affd. 464 F. 2d 1393 (C.A. 3, 1972). The "strong-proof" rule requires that the taxpayer attacking an assigned value in an agreement to which he was a party prove that the valuation had no basis in fact or business reality and did not represent the actual intention or agreement of the parties. *Edmond E. Maseeh*, 52 T.C. 18, 22 (1969); *Schulz* v. *Commissioner*, 294 F. 2d 52, 55 (C.A. 9, 1961), affirming 34 T.C. 235 (1960). The rule does not ordinarily apply against the respondent, but it is applicable where, as in the instant case, both parties to an agreement are before the court in a consolidated proceeding and the respondent adopts the position of a stakeholder. *J. Leonard Schmitz*, 51 T.C. 306, 316 (1968), affirmed sub nom. *Throndson* v. *Commissioner*, 457 F. 2d 1022 (C.A. 9, 1972); cf. *Schulz* v. *Commissioner, supra* at 55.

Though the usual application of the "strong-proof" rule is to an assigned valuation of a covenant not to compete in a sales agreement, the rule is equally applicable to the instant transaction where the parties assign a value to shares of stock. *Seas Shipping Co.* v. *Commissioner*, 371 F. 2d 528, 533 (C.A. 2, 1967) (Friendly, *J.*, concurring). Cf. *Estate of Rogers* v. *Commissioner*, 445 F. 2d 1020, 1021 (C.A. 2, 1971), affirming per curiam a Memorandum Opinion of this Court.[3] In both instances, the antithetical interests of the parties operate to insure that their valuations are realistic and meaningful.

Upon consideration of the entire record, it is our conclusion that Hess has failed to establish by "strong proof" that the fair market value of the White stock was less than its assigned valuation in the agreement. In fact, on balance we believe the evidence supports the parties' valuation.

Hess relies principally on statements made by Old Oliver and White Motor in attempting to prove that the parties did not intend to assign a fair market value to the White stock in the agreement, but merely provided for a cash adjustment in a stock for asset exchange.

It is true that both Old Oliver and White Motor referred to the

---

[2] White urges that we should apply the more stringent standard of proof enunciated by the Third Circuit in *Commissioner* v. *Danielson*, 378 F. 2d 771 (C.A. 3, 1967), against Hess because an appeal by Hess lies to the Third Circuit. Under the *Danielson* rule, "a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." 378 F. 2d at 775.

We need not decide whether the *Danielson* rule is applicable to the instant case because we find that the evidence adduced by Hess does not satisfy the less rigorous "strong-proof" rule.

[3] See also *Estate of Rochester H. Rogers*, T.C. Memo. 1970–192.

current stock market price rather than the value assigned the stock by the agreement in their press releases and letters to their shareholders. It is also true that both corporations indicated in their proxy statements that the assigned value of White Motor stock would be adjusted to its market value on the closing date, and in fact initially recorded the transaction on that basis. However, these statements do not convince us that the parties did not assign a fair market value to the stock in the agreement.

The proxy statements of both White Motor and Old Oliver also stated that the 655,000 shares of stock would be valued at $31,767,500 ($48.50 per share), and that fluctuations in the market price of the stock would not change the agreed valuation. The references to current market prices of the shares in White Motor's communications to its shareholders were requested by the Securities and Exchange Commission. Dragin testified that White's preliminary book entries and footnote in its proxy valuing the assets on the basis of the median price of the stock on the New York Stock Exchange were the result of its initial belief that this valuation was required for tax and accounting purposes, irrespective of any agreement by the parties. These book entries were changed to the valuation assigned in the agreement before its books were closed and the audit of the transaction completed, as a result of a review of the purchase by its tax department and accounting firm.

It would be difficult to believe that the statements relied on by Hess indicate that the parties changed the agreed value of the White stock. There is no evidence in the record of any communication between the parties altering the assigned value. Both parties testified that they had no agreement or discussion with respect to the treatment of the transaction for accounting or Federal income tax purposes.

An analysis of the course of the negotiations indicates that the parties assigned a fair market or cash value to the White stock in the negotiations. Old Oliver initially desired only cash for its assets, and its own board of directors later assigned the $48.50 value to the White stock.

If White Motor had been able to raise sufficient cash to complete the transaction on the basis of the parties' tentative agreement of June 1960 (500,000 shares of White stock valued at $48.50 per share plus cash or debentures), Old Oliver would have received more than $9 million (over 25 percent of the total consideration) in cash or debentures, a sum too substantial to allow a finding that the parties were negotiating solely on the basis of stock for assets.

When White Motor was unable to raise the cash, Old Oliver agreed to accept an additional 155,000 shares of White stock at the assigned

value of $48.50 in lieu of cash or debentures in that amount, when the stock was trading at a lower price on the New York Stock Exchange. This makes it very evident that Old Oliver equated the assigned value of the stock with cash and believed the shares were worth that amount.

Finally, on October 28, 1960, Old Oliver's board of directors passed the following resolution acknowledging that the terms of the sale were in accordance with the agreement:

> RESOLVED that the directors of the Company *deem the sale of assets to The White Motor Company, in accordance with the Agreement dated October 3, 1960,* between the Company and The White Motor Company, upon *the terms and conditions and for the consideration stated in said Agreement,* to be expedient and for the best interests of the Company. [Emphasis supplied.]

In some situations where stock is exchanged for property pursuant to an arm's-length agreement the courts have appraised the stock by equating its value with the value of the property exchanged therefor. *Philadelphia Park Amusement Co.* v. *United States,* 126 F. Supp. 184, 189 (Ct. Cl. 1954); *Bar L Ranch, Inc.* v. *Phinney,* 426 F. 2d 995, 1000 (C.A. 5, 1970); *Moore-McCormack Lines, Inc.,* 44 T.C. 745, 757 (1965); *Amerex Holding Corporation,* 37 B.T.A. 1169, 1191 (1938), affd. 117 F. 2d 1009 (C.A. 2, 1941), certiorari denied 314 U.S. 620 (1941). An appraisal of the assets received by White Farm supports the valuation assigned the White stock in the agreement.

The assets acquired by White Motor consisted almost entirely of fixed assets (land, building, machinery, etc.) and inventory. The fixed assets were purchased at generally 80 percent of their book value. Mailman testified that the book value of these assets was low "because some of these buildings are old and well depreciated." In June 1960, Kriser, an experienced appraiser and auctioneer of industrial property, prepared a liquidating appraisal of a portion of the fixed assets subsequently acquired by White Motor under the agreement for approximately $9 million (80 percent of book value). In his report he concluded that assets could be liquidated for $7,750,000. At trial he testified that the fair market value of these assets at that time was over $10½ million.

Old Oliver's inventory was acquired by White Motor under the agreement for approximately $18½ million (80 percent of its book value). The inventory had a low book value because Old Oliver computed its inventory on the LIFO method of accounting. On October 31, 1960, the inventory sold to White Motor had a book value of $23,-777,820, but a replacement value of $31,745,068. Thus, White Motor purchased the inventory at a discount of over $12 million from current manufacturing costs.

It is evident that the fair market value of the assets acquired by White Motor was at least equal to the purchase price set forth in the

agreement and, accordingly, by equating its value to the value of the White stock, strongly supports the value assigned the shares.

In our determination we have rejected the argument of Hess and respondent that the best evidence of the fair market value of the White stock is its mean trading price on the New York Stock Exchange on the closing date, October 31, 1960. It is true that stock market quotations have been held to be the best evidence of value of a traded stock in a number of cases. *W. T. Grant Co.* v. *Duggan*, 94 F. 2d 859 (C.A. 2, 1938) ; *Hazeltine Corporation* v. *Commissioner*, 89 F. 2d 513, 518 (C.A. 3, 1937), reversing on another issue 32 B.T.A. 110 (1935) ; *Black Hills Power & Light Co.*, 14 T.C. 1425 (1950) ; *Estate of Caroline McCulloch Spencer*, 5 T.C. 904 (1945) ; *Augustus E. Staley*, 41 B.T.A. 752 (1940) ; *Estate of Leonard B. McKitterick*, 42 B.T.A. 130 (1940). However, we note that in none of these cases cited by Hess and respondent was there an arm's-length agreement between the parties valuing the stock transferred in the transaction.[4] Further, stock exchange quotations are not the best evidence of value in all cases. *Ray Copper Co.* v. *United States*, 268 U.S. 373 (1925) ; *Heiner* v. *Crosby*, 24 F. 2d 191 (C.A. 3, 1928) ; *Moore-McCormack Lines, Inc.*, 44 T.C. 745, 759 (1965) ; *Stollberg Hardware Co.*, 46 B.T.A. 788, 795 (1942) ; cf. *Bar L Ranch, Inc.* v. *Phinney*, 426 F. 2d 995 (C.A. 5, 1970). As the Third Circuit stated in *Heiner* v. *Crosby, supra:*

Sales made at a particular time and place may be significant, but the price paid is not necessarily decisive of fair market price or value. The fact of sales, in itself and without regard to the circumstances under which the sales were made, does not conclusively establish either statutory fair market price or value. Sales made under peculiar and unusual circumstances, such as sales of small lots, forced sales, and sales in a restricted market, may neither signify a fair market price or value, nor serve as the basis on which to determine the amount of gain derived from the sale. * * * [24 F. 2d at 193.]

In *Moore-McCormack Lines, Inc.* (Mooremac), *supra*, and its companion case, *Seas Shipping Co., Inc.*, T.C. Memo. 1965–240, this Court refused to apply the trading price of Mooremac shares on the New York Stock Exchange in determining the fair market value of a block of that stock stating:

sales in 100-share lots under ordinary circumstances on a stock exchange may not serve as a reliable yardstick or measure of value in the very extraordinary circumstance of the issuance of 300,000 shares representing over 13 percent of the outstanding stock of a corporation and almost twice as many shares as were traded in the entire year of issuance. See *Maytag* v. *Commissioner*, 187 F. 2d 962 (C.A. 10, 1951), affirming a Memorandum Opinion of this Court; accord, *Safe*

---

[4] See *Estate of W. E. Telling*, a Memorandum Opinion of this Court dated June 28, 1944, where the Court held that negotiations for the sale of stock at a price in excess of the stock's trading price on the Cleveland Exchange controlled the fair market value of the stock for estate tax purposes.

*Deposit & Trust Co. of Baltimore*, 35 B.T.A. 259 (1937), affd. 95 F. 2d 806, 812 (C.A. 4, 1938) ; *James Couzens*, 11 B.T.A. 1040, 1161 (1928). [44 T.C. at 759.]

For similar reasons, we have declined to value the White stock on the basis of its trading price. The 655,000 block of White stock was far in excess of the 444,000 shares traded on the New York Stock Exchange during all of 1960. Only 3,300 shares of White shares were traded on the date of sale, October 31, 1960. The trading price on that date of about $36 was the lowest price at which that stock traded in 1960 and 1961. With the exception of the last 4 months in 1960, the stock traded near or above $48.50 per share, the value assigned in the agreement, during those 2 years. In view of these circumstances, we believe that the value assigned the White stock in the agreement and negotiated by the parties at arm's length constitutes a much more reliable measure of the value of those shares.

We have also rejected the appraisals of the White stock by the expert witnesses of Hess and respondent. Their appraisals were essentially a determination of what a block of 655,000 shares of White stock would have sold for on the date of sale, October 31, 1960. Their valuations were made on the basis of simulated secondary distributions, in which the October 31, 1960, New York Stock Exchange trading price was discounted to account for the large number of shares in the block. We are of the opinion that a valuation based on a reasonable period of time rather than 1 day would have been more meaningful. *Richardson* v. *Commissioner*, 151 F. 2d 102 (C.A. 2, 1945), affirming a Memorandum Opinion of this Court, certiorari denied 326 U.S. 796 (1946) ; cf. *Estate of Gordon A. Stouffer*, 30 T.C. 1244, 1250 (1958). As the Second Circuit stated in *Richardson* (151 F. 2d at 103) :

in cases in which evidence as to actual sale prices is the dominant or even the exclusive factor relied upon in making a valuation, nothing in the law or common sense requires the trier to attempt to ascertain what the property in question would have fetched at a sale through a sales effort begun and ended on the critical date. Surely the fair market value of, say, a residence is not measured by the price which the owner could have obtained for it on the very day upon which he first decided to sell. Rather, the measure there, as in the case here, is what "*a skillful broker could within a reasonable period have realized.*" * * * [Emphasis supplied.]

We also question the applicability of a simulated secondary distribution to the instant transaction. Under the terms of the agreement, Old Oliver would have been unable to dispose of the stock on the date of sale, but rather would attempt to distribute the shares to its shareholders at a future date. We therefore find little analogy between the situation in which a large block of shares is made available for purchase by undetermined investors, with its resultant depressing effect on the market price, and the situation in the instant case in which one

willing buyer purchases the entire block of shares in a single negotiated transaction.

Because of concessions,

*Decisions will be entered under Rule 50.*